**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
—————————————————————————————

**JEFFREY MONSOUR,**

                                        **Plaintiff,**

**v.**                                                                        **1:13-CV-0336 (BKS/CFH)**

**THE NEW YORK STATE OFFICE FOR PEOPLE WITH**
**DEVELOPMENTAL DISABILITIES, and CATHY**
**LABARGE, in her official and individual capacities,**

                                        **Defendants.**
—————————————————————————————

**APPEARANCES:**

For Plaintiff:
**Robert W. Sadowski**
Sadowski Katz LLP
11 Broadway, Suite 615
New York, New York 10006
**Stephen Bergstein**
Bergstein & Ullrich LLP
15 Railroad Avenue
Chester, NY 10918

For Defendants:
**Eric T. Schneiderman**
Attorney General of the State of New York
**Helena Lynch**
Assistant Attorney General
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, United States District Court Judge:**

                    **MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

          This litigation arises from alleged violations of Plaintiff Jeffrey Monsour's rights while

he was employed by Defendant New York State Office for People with Developmental

Disabilities ("OPWDD").  Plaintiff brings various causes of action against Defendants OPWDD and Cathy LaBarge, OPWDD's Director of Labor Relations for the Capital District.  (Dkt. No. 58, ¶ 1).  In Count I, he alleges that Defendant LaBarge retaliated against him for exercising his right to freedom of speech, in violation of the First Amendment.  (*Id.* at ¶¶ 104–09).  In Count II, he alleges that Defendant OPWDD unlawfully retaliated and discriminated against him in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*  (*Id.* at ¶¶ 110–15).  Finally in Count III, he alleges that Defendant LaBarge "wrongfully aided and abetted in discrimination against Plaintiff" in violation of New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*  (*Id.* at ¶¶ 117–18).

Defendants now move for summary judgment, seeking dismissal of each of the causes of action.  (Dkt. No. 85).  For the reasons stated below, that motion is granted in part and denied in part.

## II.     BACKGROUND[1]

### A.  The Parties' Roles

Defendant OPWDD is an agency of the State of New York, which coordinates services for individuals with developmental disabilities.  (Dkt. No. 93, ¶ 5).  "Approximately twenty percent of services are provided by state-run entities," and others are provided "through a network of . . . nonprofit[s]."  (*Id.*).  "OPWDD operates Individual Residential Alternatives ("IRAs"), which are community residences that provide room, board, and individualized service options."  (*Id.* at ¶ 6).

---

[1] The facts stated herein are drawn from the parties' submissions, including their Statements of Material Facts and Responses, as well as exhibits that the parties have submitted, to the extent that they are admissible as evidence. Where facts stated in a party's L.R. 7.1(a)(3) Statement are supported by testimonial or documentary evidence and denied with only a conclusory statement by the other party, the Court has found such facts to be true.  *See* N.D.N.Y. L.R. 7.1(a)(3); Fed. R. Civ. P. 56(e).

Plaintiff has been employed by OPWDD since July 1999 as a Direct Support Assistant—a position in which he "is responsible for direct care of people with developmental disabilities and for assisting them with living on their own." (*Id.* at ¶¶ 1–3). In this role, Plaintiff cooks, teaches skills, takes individuals on community outings, and distributes medication. (*Id.* at ¶ 3). He is also responsible for reporting suspected abuse of individuals under OPWDD's care. (*Id.* at ¶ 4).

Defendant LaBarge is a former OPWDD employee, who is now retired. (*Id.* at ¶ 8). At all times relevant to this litigation, her civil service title was "Treatment Team Leader," but her "functional title" was "Director of Labor Relations." (*Id.* at ¶ 9).[2] In this position, she had various responsibilities, including "serving Notices of Discipline." (*Id.* at ¶ 10).[3]

### B. Plaintiff's Complaints to OPWDD

At various times during his employment, Plaintiff complained to OPWDD regarding "malfeasance, abuse, waste and mismanagement" at the agency. (*Id.* at ¶ 42). He complained, *inter alia*, about a drinking water well placed too close to a septic system, flies on a cake that was served to residents, possible radon gas exposure at an IRA, improper use of physical restraints on residents, transportation for female residents that was noncompliant with federal law, and also faulty fire drill procedures and falsified fire drill reports. (*Id.* at ¶¶ 39, 42–43).

### C. Plaintiff's January 4, 2010 Notice of Discipline, Press Communications, and the LaBarge Memo

On or about January 4, 2010, Plaintiff received a Notice of Discipline ("NOD") and Statement of Charges. (*Id.* at ¶ 14). These documents contained one charge, alleging, "On July

---

[2] In her deposition, LaBarge explains, "[The c]ivil service title is the title that is given to you . . . by civil service as a result of having taken an exam. So the civil service title is Grade 25, Treatment Team Leader, but someone in that title might be doing some job functions that suggest a different type of work than a Treatment Team Leader would typically do." (Dkt. No. 97-1, p. 11).

[3] Plaintiff contends that LaBarge was responsible for "reviewing the accuracy of Notices of Discipline and had access to all personnel files." (Dkt. No. 93, ¶ 10).

16, 2009, at approximately 6:30 p.m. at the Hubbell Lane IRA, you engaged in a loud argument

with a co-worker in the presence of LVN, an individual with developmental disabilities, causing

LVN to have a stress reaction requiring medical attention." (*Id.* at ¶ 15). The proposed penalty

was a four-week suspension; however, in September 2011, Plaintiff and Defendant OPWDD

"entered into a Consent Award, in which it was agreed that Plaintiff would receive a Letter of

Reprimand, and he agreed not to 'post on any vacancies in any future home or program site

where LVN resides or receives services.'" (*Id.* at ¶ 16, Dkt. No. 85-9, p. 2). On October 6,

2011, Plaintiff was issued the Letter of Reprimand. (Dkt. No. 93, ¶ 19). It stated:

> This is to formally reprimand you for your actions as described in the
> Notice of Discipline dated January 4, 2010. As an employee of OPWDD you are
> expected to resolve your disagreements with co-workers in a non-confrontational
> matter [sic] and not in the presence of the individuals with disabilities you are
> providing care to. Be advised that any future misconduct of this nature will result
> in further disciplinary action.
>     This letter of reprimand, the accompanying Consent Award and your
> Rebuttal Letter will remain in your Personal History Folder for a period of 18
> months. At the conclusion of 18 months, you are entitled to have the Notice of
> Discipline, Letter of Reprimand, Consent Award and Rebuttal Letter expunged
> from personal history folder and destroyed by requesting such.
>     Your Rebuttal Letter dated 9/01/2011will [sic] be attached to and made a
> part of the records relating to the Notice of Discipline dated January 4, 2010.

(Dkt. No. 85-10).

On March 13, 2011, *The New York Times* published an article regarding allegations of

abuse at state-run residential facilities for individuals with developmental disabilities. (Dkt. No.

93, ¶ 38). Plaintiff had approached the *Times* journalist, and he was quoted in the article, which

states that he had made complaints and filed Freedom of Information Law ("FOIL") requests

about these issues. (*Id.* at ¶ 40).

On October 13, 2011, Defendant LaBarge emailed several colleagues a message (the

"LaBarge Memo") with the subject, "Monsour Settlement." (Dkt. No. 85-11). It read, in its

entirety:

4

I just received a copy of Mr. Monsour's settlement and am dismayed and disappointed that it is not what Capital District DDSO[4] agreed to when these negotiations were being discussed.   April Lambert, Matt Guinane and I represented The State throughout this process.  We held steadfast that we would NOT remove this NOD from Mr. Monsour's file as part of any settlement.  We did recently agree that the Letter of Reprimand could be removed, as long as the actual NOD remained as a permanent part of his file.  Now I see that the NOD only has to remain in his file for a period of 18 months.  We could never agree to do that for our employees in an abuse case.  Also, we held steadfast that there would be **no language** in the settlement suggesting "no admission of guilt", yet I see in Mr. Monsour's rebuttal letter, which we have been directed to include with the NOD, that he states "My agreement to receive the Letter of Reprimand and Consent Award is in no way an admission of guilt . . ."  We did not have any discussion about any type of "rebuttal" statement to be included with this NOD, nor have we ever entertained a rebuttal statement in the past.  The rebuttal statement that I received is not signed by Mr. Monsour nor by his attorney, Mr. Sadowski.  I'm sure you are aware that his intent in including the "no admission of guilt language" is in fact his attempt to manipulate the FOIL process.  With the "no admission of guilt" language, he is now under the impression that his personal Notice of Discipline is not FOILable under the guidelines we use.  If in fact this rebuttal letter **must** be included with his NOD, I would like to ask that counsel's office to [sic] weigh in on whether it does render his NOD as unable to be FOILed.  Again, this was one of our major points during this extremely lengthy arbitration process.  Please advise.

(*Id.*) (emphasis and ellipsis in original).  She forwarded the same email to union leadership.

(Dkt. No. 93, ¶ 35; Dkt. No. 97-1, pp. 116–17).  Later, around November 2011, Plaintiff's name was placed on a list of OPWDD staff who were found to have substantiated charges of abuse.

(Dkt. No. 97-12, p. 25).

### D.  Plaintiff's Bids for Positions with OPWDD

Plaintiff bid (applied) for several employment positions at OPWDD and was denied.

(Dkt. No. 93, ¶ 34).  The agency denied his bid for a position at the Glens Falls IRA on May 13, 2011, stating that the reason for denial was that there was a gender-specific need.  (*Id.*).  The agency again denied Plaintiff's bid for a position at the Stony Creek Road IRA on January 4, 2013; the given reason for denial was that another candidate was selected.  (*Id.*).  On January 9,

---

[4] DDSOs are organizational units within OPWDD.

2013, Plaintiff was denied a position at the Route 50 IRA, purportedly because of the "[o]perating needs of the agency." (*Id.*). Plaintiff was also denied positions on March 13, 2013, June 10, 2013, August 22, 2013, and April 23, 2014. (*Id.*). The agency provided the same or similar reasons for each denial. (*Id.*).[5]

### E.  Complaint Regarding Pedophile's Attendance at Halloween Event

In or around October 2012, Plaintiff complained that a resident, who was a registered sex offender, was permitted to attend a Halloween event at an amusement park in violation of his Risk Management Plan. (*Id.* at ¶ 44). Plaintiff also complained that the individual was at risk of re-offending and that his attendance could have put staff and the public at risk. (*Id.*).

### F.  Administrative Leave and Reassignment

On March 25, 2013, Plaintiff filed the original Complaint in this action. (*Id.* at ¶ 45). Two days later, on March 27, an article appeared in a Glenn Falls newspaper, which "described the allegation in the Complaint that Plaintiff complained [about] an OPWDD resident who was a sex offender being allowed to attend the Fright Fest event." (*Id.* at ¶ 46). In response to that article, an IRA resident requested an OPWDD Form 147 be filed, "which is a form used to file a 'Reportable Incident,' a 'Serious Reportable Incident,' or an 'Allegation of Abuse.'" (*Id.* at ¶ 48). The same resident gave an interview, the video of which was filed under seal, expressing *inter alia* that he no longer trusted Plaintiff and did not want to be in the same house as Plaintiff. (*Id.* at ¶ 47; Dkt. No. 85). Notably, Plaintiff denies that the statements on the Form 147 are true and contends that "residents of the Stony Creek IRA were induced with bribes or coerced with deprivation of outings and privileges with the intent of causing them to falsely accuse Mr. Monsour of wrongdoing." (Dkt. No. 93, ¶ 48).

---

[5] Plaintiff argues that these reasons are pretextual. (Dkt. No. 93, ¶ 34).

Nevertheless, Plaintiff was placed on administrative leave from Stony Creek IRA in July 2013.  (*Id.* at ¶¶ 50–53).  In April 2014, when he was scheduled to return to the Stony Creek IRA, a resident became upset and stated that Plaintiff had pushed him in a 2012 incident.  (*Id.* at ¶ 54).  After that complaint, Plaintiff was again placed on administrative leave.  (*Id.* at ¶ 55).

### G.  Plaintiff's Counter Statement of Facts[6]

Plaintiff alleges that around 2004, he began to "witness things he thought were wrong and [] report[] incidents to his supervisors, and also started to make [FOIL r]equests out of concern that what he witnessed could be widespread."  (*Id.* at ¶ 6).  He further alleges that after he reported an incident regarding food safety at an IRA kitchen, OPWDD "began to serve up retribution . . . when he exposed something the agency would not want the public to know."  (*Id.* at ¶ 8).  He alleges that he also contacted a *New York Times* investigative reporter, which resulted in "a three-part exposé of the waste, fraud, and abuse that was found to be rampant in the OPWDD system" and also in further retaliation against him.  (*Id.* at ¶ 9).  He alleges that OPWDD "fabricate[d] incidents, for which they sought to discipline him either to heighten the intimidation, or discredit him and his reports, or to create a record for the agency to justify putting him on leave or to terminate him."  (*Id.* at ¶ 10).

He also alleges that after the 2010 NOD, which was the first in his career, the charge was settled under terms that he would receive a letter of reprimand but that (1) "his personnel file would contain a non-admission of guilt and a rebuttal of the charge," and (2) "all references to the NOD would be expunged from his personnel file in 18 months."  (*Id.* at ¶ 11).  He alleges

---

[6] Citations herein refer to paragraph numeration beginning on page 27 of Plaintiff's Counter Statement of Facts, as permitted by L.R. 7.1(a)(3).  (Dkt. No. 93, p. 27).  Defendants have failed to respond to the counter-statement.  To the extent that the Plaintiff has placed material facts into dispute in this Counter Statement, which have not been rebutted, Defendant has failed to meet its burden of showing its entitlement to summary judgment.  *See Okeke v. New York and Presbyterian Hospital*, No. 16-CV-570 (CM), 2017 WL 1536060, at *1, 2017 U.S. Dist. LEXIS 64026, at *2 (S.D.N.Y. Apr. 24, 2017).

that "Defendant LaBarge was one of the two prosecutors at the arbitration," that the NOD was not removed from his personnel file, and that the October 13, 2011 LaBarge email—suggesting psychological abuse for which he was never charged in the NOD—was added to it.  (*Id.* at ¶ 13). According to Plaintiff, LaBarge "had control" of his personnel file and "circulated the e-mail to high ranking officials at OPWDD."  (*Id.* at ¶ 14).  He also alleges that shortly after the settlement, LaBarge perpetuated the charge of psychological abuse and that she "kept a separate file on [Plaintiff] in her office . . . [and] admitted that she kept things in that file that would not otherwise be maintained in [his] personnel file."  (*Id.* at ¶ 32).  The file was allegedly "by far the largest file she maintained on any individual."[7]  (*Id.*).

Plaintiff also alleges that "he obtained NODs containing allegations of physical abuse of residents by employees who were later promoted," and that "[t]he agency expressed its displeasure with the release of this information."  (*Id.* at ¶¶ 68–69).  He further alleges that despite ongoing allegations and investigations against him, including alleged OPWDD bribery or threats to induce residents to make complaints about Plaintiff, he continued to raise his concerns about fraud, waste, and abuse at OPWDD residences.  (*Id.* at ¶¶ 71–81, 96–110).

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of

---

[7] Defendant LaBarge testified at her deposition that she kept similar files on other OPWDD employees.  (Dkt. No. 97-1, p. 92).

the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)

(quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

## IV.   DISCUSSION

### A.  First Amendment Retaliation Claim

Plaintiff brings a claim under 42 U.S.C. § 1983, alleging that Defendant LaBarge, a State official, retaliated against him in violation of the First Amendment to the United States Constitution.  He asserts that she disparaged him, falsely accusing him of "psychological abuse," in an email sent to high-ranking managers at OPWDD that "turned up" in his personnel file, in retaliation for his internal complaints about practices and conditions at OPWDD and his communications with *The New York Times*.  (Dkt. No. 92, pp. 8–9, 21–23).  He argues that her email "would have been reviewed as part of the promotion process," and that he was denied promotions in June and August 2013.  (*Id.*, p. 22).  The Second Circuit has noted that to survive summary judgment on this claim, "a public employee must establish a prima facie case by bringing forth evidence showing that (1) he has engaged in protected First Amendment activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action."  *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (quoting *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007) (internal quotation and alterations omitted)).  The *Smith* court continued:

> As relevant here, the First Amendment protects speech uttered by an employee in his or her capacity as a citizen regarding a matter of public concern.  *Lane v. Franks*, 134 S. Ct. 2369 . . . (2014).  To demonstrate a causal connection "a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167 (2d Cir. 2006) (internal quotation marks omitted).  A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action.  *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004) (internal citation omitted).  Since a direct showing requires plaintiff to provide

"tangible proof" of retaliatory animus, "conclusory assertions of retaliatory motive" are insufficient.  *Id.*

*Smith*, 776 F.3d at 118–19.  "To establish a genuine issue of material fact with regard to whether a particular action constitutes an adverse employment action in the First Amendment retaliation context, a plaintiff must show that the retaliatory action 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'"  *Rivers v. N.Y. City Hous. Auth.*, 176 F. Supp. 3d 229, 250 (E.D.N.Y. 2016) (quoting *Zelnik v. Fashion Ins. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)).

### 1. Protected Speech

As noted above, the First Amendment protects speech uttered by an employee in his or her capacity as a citizen regarding a matter of public concern.  *Smith*, 776 F.3d at 118 (citing *Lane v. Franks*, __ U.S. __, 134 S. Ct. 2369, 2378 (2014)).  "A matter of public concern is one that relates to 'any matter of political, social, or other concern to the community,' as opposed to one that addresses merely personal employee grievances."  *Pisano v. Mancone*, No. 08 Civ. 1045 (KMW), 2011 WL 1097554, at *9, 2011 U.S. Dist. LEXIS 28864, at *29 (S.D.N.Y. Mar. 18, 2011) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).  Here, Plaintiff's allegations of mismanagement and abuse in State-operated group homes are a matter of public concern.  *See Barclay v. Michalsky*, 451 F. Supp. 2d 386, 396 (D. Conn. 2006) (finding that "the treatment of psychiatric patients at a state facility and the systems and policies in place to ensure those patients receive proper treatment and adequate care" is a matter of public concern).

The more arduous question is whether Plaintiff spoke in his capacity as a citizen, rather than pursuant to his official duties.[8]  When public employees speak pursuant to their official

---

[8] "Whether the employee spoke solely as an employee and not as a citizen is also largely a question of law for the court."  *Jackler v. Byrne*, 658 F.3d 225, 237 (2d Cir. 2011).

duties, they "are not speaking as citizens for First Amendment purposes" and their speech is not

entitled to First Amendment protection.  *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 201 (2d Cir.

2010) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (internal quotation omitted)).

Determining whether speech is pursuant to official duties is "not susceptible to a brightline rule,"

and courts "must examine the nature of the plaintiff's job responsibilities, the nature of the

speech, and the relationship between the two."  *Matthews v. City of New York*, 779 F.3d 167, 173

(2d Cir. 2015).  In this analysis, courts consider whether the speech "was a means to fulfill" and

"undertaken in the course of performing" the speaker's "primary employment responsibility."

*Weintraub*, 593 F.3d at 203 (citing cases).  Courts also distinguish between speech "for which

there is no relevant citizen analogue" and speech contained within "public statements outside the

course of performing [an employee's] official duties."  *Id.* at 203–04 (citing cases).

Here, when asked at his deposition what motivated Defendant LaBarge to retaliate

against him, Plaintiff replied,

> You'd have to ask Cathy [LaBarge].  Maybe management was mad because of the
> New York Times articles.  Maybe they were upset about me suggesting that we
> have more management around when the individuals are actually home.  Maybe
> they were upset that I had the RNs—no RNs on duty after 5:00.

(Dkt. No. 85-4, p. 14).  In his memorandum, Plaintiff argues that his protected speech was "in

the form of his communications with *The New York Times* and his internal complaints about the

abusive and wasteful practices at the agency."  (Dkt. No. 92, p. 21).  Defendant failed to address

the issue.

### a.  Internal Complaints

The parties agree that Plaintiff, as an OPWDD employee, was "responsible for direct care

of people with developmental disabilities" and that his duties included "reporting suspected

abuse of individuals in OPWDD's care."  (Dkt. No. 93, ¶¶ 3–4).  As a caretaker, the essence of his day-to-day responsibilities was to ensure the well-being of the residents under his charge.

In *Weintraub*, a public school teacher filed a formal grievance with his union, in which he challenged the school administration's decision not to discipline a student in his classroom.  593 F.3d at 201.  The *Weintraub* court concluded, *inter alia*, that the teacher's "grievance was 'pursuant to' his official duties because it was 'part-and-parcel of his concerns' about his ability to 'properly execute his duties[]' . . . as a public school teacher—namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning." *Id.* at 203.  Thus, "[i]n *Weintraub*, [the Second Circuit] held that a school teacher's formal grievance regarding the administration's refusal to discipline a student was unprotected speech because a teacher's need to discipline his own students is essential to his ability to effectively run a classroom as part of his day-to-day responsibilities."  *Matthews*, 779 F.3d at 173 (citing *Weintraub*).

Like in *Weintraub*, Plaintiff's internal communications reporting suspected abuse of individuals in OPWDD's care are "part and parcel" of his underlying duty.  That speech was accordingly not protected.  *See Matthews,* 779 F.3d at 173; *Weintraub*, 593 F.3d at 204.

### b.  Communications with *The New York Times*

Plaintiff's communication with *The New York Times* is a different story.  Though he was obligated to report instances of abuse as part of his employment, nothing in the record suggests that this duty included public disclosure.  Moreover, when a public employee communicates concerns about an area related to his job duties "to persons outside the work[]place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen."  *Carter v. Inc. Vill. of Ocean Beach*, 693 F.

Supp. 2d 203, 211 (E.D.N.Y. 2010) (quoting *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008) (internal quotation omitted)).  Additionally, contacting a newspaper is an archetypal example of speech that has a citizen analogue.  *See Weintraub,* 593 F.3d at 203–04.  For these reasons, considering the nature of the speech and its relationship to Plaintiff's job responsibilities as directed by *Matthews*, the Court finds that Plaintiff spoke as a citizen rather than in an official capacity when communicating with *The New York Times*; consequently, the speech is protected under the First Amendment.

### 2.  Adverse Employment Actions and Causation

"[I]n the context of a First Amendment retaliation claim, an adverse action is any 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'"  *Seale v. Madison County*, No. 5:11-CV-0278 (GTS/ATB), 2015 WL 667531, at *15, 2015 U.S. Dist. LEXIS 24519, at *60 (N.D.N.Y. Feb. 17, 2015) (quoting *Zelnik*, 464 F.3d at 225).  An adverse action may include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," as well as "lesser actions" like "negative evaluation letters [and] express accusations of lying."  *Zelnik*, 464 F.3d at 226 (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)) (internal quotation omitted).  "[A] critical mass of minor incidents may support a claim for retaliation."  *Wrobel v. County of Erie,* 692 F.3d 22, 31, n.2 (2d Cir. 2012).  The determination of whether conduct qualifies as an adverse action is "heavily fact-specific" and "contextual."  *Zelnik*, 464 F.3d at 226.

"A plaintiff may establish a causal connection between the protected activity and the adverse employment action either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity

was followed closely by discriminatory treatment." *Seale*, 2015 WL 667531, at *13, 2015 U.S. Dist. LEXIS 24519, at *38 (internal quotations omitted).

Plaintiff argues that after he provided information to *The New York Times* that was published in March 2011, Defendant LaBarge retaliated against him by writing the LaBarge Memo on October 13, 2011, which "turned up" in his personnel file, as well as "perpetuat[ing] the charge of psychological abuse in e-mail communications with high level managers at OPWDD." (Dkt. No. 92, pp. 11–12, 17–18, 20–22). Plaintiff also argues that his personnel file did not contain his rebuttal letter to the charge, in violation of the representation in the letter of reprimand. (Dkt. No. 92, p. 8.)[9] He also alleges that the LaBarge Memo "caused [him] to be denied promotions." (Dkt. No. 97-2, p. 39).

Plaintiff argues that the LaBarge email falsely accused him of psychological abuse. (Dkt. No. 92, p. 22). Accusations can constitute adverse actions. *See, e.g.*, *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006); *Bernheim v. Litt*, 79 F.3d 318, 324 (2d Cir. 1996). In the memo LaBarge states that "[w]e would never agree to [remove both a Letter of Reprimand and an NOD from a personnel file] for our employees *in an abuse case.*" (Dkt. No. 85-11, p. 2) (emphasis added). The NOD does not mention or charge Plaintiff with psychological abuse. (Dkt. No. 97-1, pp. 76, 84). The parties dispute whether the incident can be characterized as psychological abuse. (Dkt. No. 93, ¶ 17). Defendant has not responded to Plaintiff's assertion that LaBarge falsely accused him of psychological abuse, and the Court has thus not considered whether the email alone is an adverse action.[10]

---

[9] Plaintiff also complains about the fact that the notice of discipline was not removed from his personnel file; the letter of reprimand states that it would be expunged and destroyed after 18 months "by request[ ]."

[10] The fact that LaBarge characterized the incident as psychological abuse, long before and long after the New York Times article, may bear on whether the LaBarge email was retaliatory in violation of the First Amendment. (In a June 2010 email, LaBarge characterized the Notice of Discipline as "for psychological abuse." (Dkt. No. 97-1, p.

Plaintiff argues that LaBarge retaliated against him by placing the LaBarge Memo in a file available to those responsible for employment decisions. Plaintiff has failed to adduce any direct evidence that Defendant LaBarge was responsible for the memo's inclusion in the file. When asked at his deposition whether he believed that she had directed that the LaBarge Memo be placed in his file, he responded, "*I have no idea if she did it.* But she was the director of Labor Relations so she had full control of the document and my personal history file." (Dkt. No. 85-4, p. 7) (emphasis added).[11] LaBarge testified at her deposition that she "didn't have any responsibility for personnel files or personal history files" but that she had "ready access" to them. (Dkt. No. 85-6, pp. 4–5).[12] She also testified that she was surprised that the LaBarge Memo was in "Plaintiff's personal history folder," that she did not know who placed it there, and that she did not direct her secretary to place it there. (Dkt. No. 85-25, ¶¶ 18–19).

Plaintiff testified that when he looked at his personal history file sometime before March 2013, he found LaBarge's email attached to the NOD and that his rebuttal letter was not in the file. (Dkt. No. 97-2, p. 33). LaBarge explained that when Plaintiff came to her office to review his personnel file she "unfortunately" delegated the job of reviewing the file in advance, to make sure nothing was misfiled, to her secretary. (Dkt. No. 97-1, p. 112–13). LaBarge's secretary tried unsuccessfully to alert LaBarge to the fact that the LaBarge memo should not have been in the file, but by that point Plaintiff had already seen the memo. (Dkt. No. 97-1, pp 113–14). The personal history file, in keeping with LaBarge's strenuous objections to the settlement, did not

---

156). In a March 6, 2013 email, LaBarge describes Plaintiff's conduct as "psychological abuse plain and simple," noting that "he just doesn't like the words . . . Too bad." (*Id.* at p. 195)).

[11] Plaintiff argues that the handwritten notation on the memo, "Jeff Monsour settlement NOD 1/4/10," indicates that it was to be filed in his personal history file, but he has not identified the author of that handwriting. (Dkt. No. 93, p. 10). LaBarge testified at her deposition that the notation was in her secretary's handwriting. (Dkt. No. 97-1, p. 104).

[12] LaBarge maintained another file on Plaintiff. On March 3, 2011, she was asked, and agreed to keep a "discreet file" of all emails sent by Plaintiff regarding his disciplinary matter. (Dkt. No. 97-1, p. 165).

include Plaintiff's rebuttal letter; nor had the disciplinary documents been expunged.  On this record a reasonable juror could infer LaBarge's involvement in causing the memo to be placed in Plaintiff's personal history file.

Plaintiff argues that since the email was in his personal history file, it would have been reviewed as part of the promotion process, and cites to two promotions he was denied in the summer of 2013—the job posting number 13-245 (Dunn Ave.) and the job posting number 13-383 (Hubbell Lane).  (Dkt. No. 92, p. 22); *see also* (Dkt No. 93, ¶ 79) (Plaintiff's counter statement of material fact alleging retaliatory denials of positions sought at Dunn Avenue, Glens Falls and Stony Creek).  The parties dispute whether there were legitimate reasons for seven positions denied to Plaintiff from May 13, 2011 to April 23, 2014.  (Dkt. No. 93, ¶ 34).

According to the Director of Human Resources, prior to May 2013 promotions were given "to the applicant with the most seniority."  (Dkt. No. 85-26, ¶ 14).  In May 2013, the process changed to one in which applicants were interviewed and evaluated by a panel of supervisory staff.  (*Id.* at ¶ 17).  Then, "[f]or the three applicants who received the highest scores, the panel asked the Office of Human Resources to review the applicants' personnel history folders to see if they contained: (i) Notice of Discipline for abuse or misconduct . . . ."  (*Id.*).  LaBarge testified that the only people that looked at Plaintiff's personal history file were individuals in HR.  (Dkt. No. 97-1, p. 110).

Defendants have submitted evidence from two individuals who interviewed Plaintiff in 2012 for job posting number 12-545 (Stony Creek Rd.).  The interviewers for that position rated Plaintiff's answers and "provided that information to the Human Resources Office."  (Dkt. No. 85-28, ¶ 4; Dkt No. 85-30, ¶ 4).  They did not see Plaintiff's personal history file and did not consider the LaBarge email.  (Dkt. No. 85-28, ¶¶ 5–6; Dkt. No. 85-30, ¶¶ 5–6).  The

17

interviewers' affidavits, however, do not indicate who made the ultimate promotion decision or what that person reviewed.[13]  (Dkt. No. 85-28, ¶¶ 2, 5).  Defendants state that Plaintiff could not be awarded the position for job posting 13-383 under the terms of the consent award because LVN—the individual who overheard Plaintiff's fight with a co-worker—lived at that location. (Dkt. No. 93, ¶ 36).  Defendants have not responded to Plaintiff's argument regarding the job posting 13-245 (Dunn Avenue).  Neither of the parties has addressed the evidence that, as of 2007, all decisions relating to Plaintiff were "pushed up the chain" to the Director of OPWDD, Cheryl Greiner—one of the recipients of the LaBarge email.  (Dkt. No. 97-11, p. 90).[14]  Thus, on this record the Court finds that the Defendants have failed to establish that there is no material issue of fact as to whether anyone involved in these employment decisions saw the LaBarge Memo.

In addition, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action."  *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 512 (E.D.N.Y. 2011) (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (internal quotation omitted)).  In some cases, courts within the circuit have found that the passage of six to eight months between protected activity and adverse action is still sufficient to support an inference of causation.  *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980).  Here, there were approximately seven months

---

[13] Nor is it clear why that promotion was decided after an interview process when the Director of Human Resources stated that promotions prior to May 2013 were given to the applicant with the most seniority.  (Dkt. No. 85-26, ¶ 14).

[14] On October 20, 2011, Greiner forwarded LaBarge's email to Susan Simmons at OPWDD with a note "for the JM file."  (Dkt. No. 97-1, p. 183).

between Plaintiff's protected activity with The New York Times and LaBarge's October 2011 email.  Courts recognize that defendants may have "waited to exact their retaliation at an opportune time," *Espinal*, 558 F.3d at 129, and here, Plaintiff argues that LaBarge "was not able to retaliate against [him] any earlier than October 2011, when she wrote the email."  (Dkt. No. 92, p. 23).  The Court finds that Plaintiff has raised a material issue of fact regarding causation.

Defendants argue that Defendant LaBarge is entitled to qualified immunity.  Qualified immunity "protects government officials from liability when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Manners v. New York State Dep't of Envtl. Conservation*, No. 6:14-CV-810 (MAD/TWD), 2015 WL 4276465, at *15, 2015 U.S. Dist. LEXIS 90828, at *37 (N.D.N.Y. July 14, 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Crediting all inferences in Plaintiff's favor, LaBarge is not entitled to qualified immunity because a reasonable person in her position would have known that circulating false allegations of abuse to high ranking officials at OPWDD in retaliation for Plaintiff's speech as a public citizen on matters of public concern violates the First Amendment.

### B.  Rehabilitation Act Claim

Plaintiff also argues that Defendant OPWDD discriminated against him in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*  Section 504 of that Act establishes that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . ."  29 U.S.C. § 794(a).  Plaintiff alleges that Defendant OPWDD retaliated against him "for whistleblowing on

Defendants' violations of the rights of individuals with disabilities" and that it discriminated against him by "fail[ing] to engage in any corrective actions after Plaintiff alerted Defendants of their violations. (Dkt. No. 58, ¶ 111).

Claims for retaliation under the Rehabilitation Act are analyzed under the same burden-shifting framework established for Title VII cases. *Atencio v. United States Postal Service*, 198 F. Supp. 3d 340, 361 (S.D.N.Y. 2016). To establish a prima facie case of retaliation under Section 504 of the Rehabilitation Act, the plaintiff must allege that (i) he engaged in protected activity; (ii) the defendant was aware of this activity; (iii) the defendant took adverse action against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action. *Hodges v. Attorney General of United States*, 976 F. Supp. 2d 480, 494 (S.D.N.Y. 2013); *Collins v. City of New York*, 156 F. Supp. 3d 448, 458 (S.D.N.Y. 2016).[15] "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. If a defendant meets this burden 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002).

Protected activity "refers to action taken to protest or oppose statutorily prohibited discrimination." *Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 236 (2d Cir. 2012) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)). Under the Rehabilitation Act, a "qualified individual with a disability" shall not be excluded from or denied the benefits of a public entity's services or programs "solely by reason of her or his disability." 29 U.S.C. §

---

[15] It is unsettled in this Circuit whether a plaintiff must show that the retaliation was a "but for" cause or merely a motivating factor. *See Eisner v. Cardozo*, No. 16-872-cv, __ Fed. App'x __, 2017 WL 1103437 (March 24, 2017); *Kelly v. New York State Office of Mental Health*, 200 F. Supp. 3d 378, 403 n.12 (E.D.N.Y. 2016). As set forth below, the Court does not need to decide the standard in this case.

794(a); *see B.C. v. Mount Vernon School District*, 837 F.3d 152, 158 (2d Cir. 2016).  "Exclusion or discrimination may take the form of disparate treatment, disparate impact, or failure to make a reasonable accommodation."  The Northern District recently explained that the mistreatment of persons with disabilities does not *necessarily* reflect discrimination by reason of their disability. *See Maioriello v. New York State Office for Developmental Disabilities*, 1:14-CV-0214 (GTS/CFH), 2015 WL 5749879, at *14–15, 2015 U.S. Dist. LEXIS 131967, at *37–38 (N.D.N.Y. Sept. 30, 2015) (citing *Beaver v. Melotte*, 08-C-0187, 2008 WL 4610317, at *1, 2008 U.S. Dist. LEXIS 110966, at *3–4 (E.D. Wis. Oct. 15, 2008)).  The *Maioriello* court quoted an example of this principle, provided by the Eastern District of Wisconsin:

> Suppose that instead of a home for the disabled we were dealing with conditions at a women's prison.  If the allegation was that certain female inmates were being mistreated, no one would conclude that they were being discriminated against on the basis of their gender—the alleged victims were not treated worse than men. Similarly, the fact that residents of a home for the disabled are allegedly mistreated does not mean that such treatment is 'by reason of' their disability. Otherwise, any tort committed in a facility for a specifically protected group would be turned into a discrimination case.

*Id.* (quoting *Beaver*).

The *Maioriello* court considered allegations by an OPWDD employee akin to those in the case-at-bar; namely, that OPWDD had retaliated against the employee after she reported abuse of residents.  *Id.* at 2015 WL 5749879, at *1–2, 2015 U.S. Dist. LEXIS 131967, at *2–7.  At the motion to dismiss stage, that court found that two of plaintiff's reports of abuse could constitute protected activity: (1) a report that an OPWDD care provider had referred to a resident with "epithets [that] suggest that the speaker (who presumably was one of the individuals who otherwise mistreated [the resident]) considered [him] less than human due to some physical deformity such as one that sometimes afflicts disabled persons;" and (2) a report that "unidentified [residents] were subjected to a game called 'fetch,' in which they would 'go after

21

and eat . . . food off the floor' after the food had been thrown there by staff . . . [which] suggests that the staff members participating in the game were knowingly taking advantage of the consumers' inability to pick the food up off the floor and/or decline to 'play.'"  *Id.* at 2015 WL 5749879, at *15, 2015 U.S. Dist. LEXIS 131967, at *39–40.

Although Plaintiff must show that his complaints pertained to discrimination against OPWDD residents based on their disabilities, his memorandum provides no argument on this point.  (*See generally* Dkt. No. 92, pp. 26–28).  Plaintiff cites to his repeated reports regarding "a sex-offender's close contact with children in connection with the Fright Fest outing," which allegedly led to administrative leave; transfer to another IRA; and denial of a promotion.  (*Id.* at p. 27).  Plaintiff, however, has failed to provide any basis for concluding that his reports regarding management's failure to follow a sex offender's risk management plan constitutes action protesting or opposing disability discrimination.  Nor does the Court find any basis for concluding that Plaintiff's complaints regarding systemic failures of the OPWDD and mismanagement at OPWDD facilities, including his complaints that a drinking well was too close to a septic system and that the agency failed to conduct radon gas testing, are protected activities under the Rehabilitation Act.

Conversely, Plaintiff's Response Statement of Material Facts contains additional facts, which suggest that he did complain about unlawful discrimination.  He adduces evidence that at Fenway IRA, OPWDD "was diverting staff from the people who cannot speak up for themselves," which he called "lower functioning individuals," and that OPWDD management "became furious with him" when he raised this problem.  (Dkt. No. 93, ¶¶ 80–81).  Plaintiff testified that in response to his complaint, he was purposefully assigned to three female residents, and subjected to a purported training scenario that was, in fact, an adverse action.  (Dkt. No. 97-

5, pp. 10–13; Dkt No. 97-6, p. 18).  He testified that two female staff members and a nurse told him that he would be trained in female perineal care, and then they brought him to the room of a female resident who was unable to speak and could not give consent for a male staff member to perform the care.  (Dkt. No. 93, ¶ 108).  The nurse told Plaintiff to proceed.  (*Id.*).  Plaintiff expressed his discomfort and stated that training like this is done on a mannequin and in a classroom setting.  (*Id.* at ¶ 109).  The nurse and staffers then told him to sign a paper that he was receiving the training, threatening that he would have to perform perineal care on another female resident if he refused.  (*Id.*).  Plaintiff immediately reported the incident, which he believed to be unprecedented in his tenure at OPWDD.  (*Id.* at ¶ 110).  He then took a short leave of absence for a stress reaction.  (*Id.*). While Plaintiff failed to provide evidence of when this complaint and retaliation occurred, he has described it as "post-complaint retaliation," and indicated that it occurred after the October 2011 "Fright Fest."  (Dkt. No. 97-5, pp. 12–13; Dkt. No. 93, pp. 59, 61).

Plaintiff provided evidence of another incident, in which he and a co-worker working at the Dunn Avenue IRA complained to management on behalf of a resident, MAG, "who moved by rolling around on the floor, often banging her head" and was "nonverbal and was licking the floor," (*Id.* at ¶ 50).  Plaintiff alleges that he and his co-worker complained about letting MAG roll on the floor; that management was unhappy about this complaint; and that eventually MAG was given a wheelchair.  (*Id.*).  The co-worker testified that they worked at Dunn Avenue "within the last few years" of his deposition on July 7, 2016.  (Dkt. No. 97-14, p. 17).  Again, while Plaintiff has provided little temporal context, he appears to argue that it was causally related to the perineal care retaliation.  (Dkt. No. 97-6, pp. 18–19).

In retaliation cases, the standard for an "adverse employment action" is "not as demanding as it is in a discrimination claim." *Quadir v. New York State DOL*, 39 F. Supp. 3d 528, 542 (S.D.N.Y. 2014). Plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 542–43 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Plaintiff's burden at the *prima facie* stage is de minimis. *Id.* at 543 (internal quotation omitted). Plaintiff has met that burden. On the evidence Plaintiff has provided here, a reasonable juror could find that the unorthodox "training" incident constituted an adverse action. Plaintiff has likewise adduced evidence that this incident was causally related to his complaints of discrimination against OPWDD residents, testifying at his deposition that after the complaints he was "purposefully assign[ed ] to the female residents" when female co-workers were available and that "[n]o other male employee has ever been trained like that in the history of OPWDD." (Dkt. No. 97-5, pp. 10, 12). Plaintiff also testified at his deposition that the perineal care "training" was orchestrated by a particular treatment team leader, Deb Murphy, whose group homes he had been complaining about. (Dkt. No. 97-6, pp. 18–19). The Defendants have not addressed Plaintiff's claims regarding perineal care, and have not articulated a non-retaliatory reason. Even if Plaintiff is required to prove but-for causation, the Court finds that on this record, which includes evidence of conduct protected by the First Amendment, conduct protected by the Retaliation Act and non-protected whistleblowing, the factual question of whether the perineal care training was caused by conduct protected by the Rehabilitation Act is best left to the jury. *See*, *e.g.*, *Zann Kwan v. Andalez Grp. LLC*, 737 F.3d 834, 846 n. 5 (2d Cir. 2013) ("The determination of whether retaliation was a "but-for" cause, rather than just a motivating factor, is

particularly poorly suited to disposition by summary judgment because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact").  The motion to dismiss the Rehabilitation Act claim is therefore denied.[16]

### C.  New York State Law Claim

Plaintiff alleges that Defendant LaBarge aided and abetted retaliation in violation of NYSHRL § 290 *et seq.*  (Dkt. No. 58).  To prove this claim, Plaintiff must show that Defendant LaBarge "aided or abetted a primary violation of the [NYS]HRL committed by another employee or the business itself," *Rivera v. Prudential Ins. Co. of Am.*, No. 95-CV-0829, 1996 WL 637555, at *13, 1996 U.S. Dist. LEXIS 16337, at *39 (N.D.N.Y. Oct. 21, 1996) (internal quotation marks omitted), and that she actually participated in that primary violation.  *Williams v. Rosenblatt Sec. Inc.*, No. 14-CV-4390 (JGK), 2016 WL 4120654, at *4, 2016 U.S. Dist. LEXIS 96368, at *11 (S.D.N.Y. Jul. 22, 2016).  To establish a *prima facie* case of a primary violation of the NYSHRL, Plaintiff must prove that (1) he engaged in an activity protected by the NYSHRL; (2) OPWDD was aware of that activity and took an adverse employment action against him; and (3) a causal connection existed between his protected activity and the adverse action.  *Kessler v. Westchester Cty. Dep't of Soc. Serv.*, 461 F.3d 199, 205–06 (2d Cir. 2006); *see also Bliss v. MXK Rest. Corp.*, 2016 WL 6775439, at *3 (S.D.N.Y. Nov. 14, 2016) ("Retaliation claims under [the] NYSHRL . . . are subject to the same analysis as retaliation claims under Title VII.") (internal quotation marks and citation omitted).

In his deposition, Plaintiff was asked whether there was "a particular person's action that she aided and abetted," to which he responded, "You really have to discuss that with her, or

---

[16] In light of Plaintiff's failure to address how the other alleged acts of retaliation were causally connected to protected conduct, the Court has not considered Plaintiff's other allegations.  To the extent Plaintiff seeks to raise other issues at trial, Plaintiff will need to identify other specific instances of protected conduct and adverse actions that are causally connected to the protected conduct.

review the discovery emails that you gave to [counsel]." (Dkt. No. 97-3, pp. 7–8). This speculation is insufficient to withstand summary judgment. *See Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.") (internal citations omitted); *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (noting that a factual argument based on "conjecture or surmise" is insufficient to defeat summary judgment).

Plaintiff has failed to respond to Defendant's motion to dismiss this claim, and the Court is not aware any evidence that would raise a material issue of fact for trial. Therefore, having failed to identify a specific NYSHRL violation that Defendant LaBarge aided and abetted, Plaintiff's State law claim must fail. *See Bennett v. Progressive Corp.*, 225 F. Supp. 2d 190, 213–14 (N.D.N.Y. 2002).

## V.      CONCLUSION

For these reasons, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 85) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Defendants' motion to dismiss Plaintiff's federal claims (Counts I and II) is **DENIED**; and it is further

**ORDERED** that Defendant's motion to dismiss Plaintiff's state law claim (Count III) is **GRANTED**, and the claim is **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

July 7, 2017
Syracuse, New York

*Brenda K Sannes*

Brenda K. Sannes
U.S. District Judge

26