**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JEFFREY MONSOUR,

Plaintiff,   1:13-cv-00336 (BKS/CFH)

v.

THE NEW YORK STATE OFFICE FOR PEOPLE WITH
DEVELOPMENTAL DISABILITIES, and CATHY
LABARGE, in her individual capacity,

Defendants.

---

**APPEARANCES:**

*For Plaintiff:*

Robert W. Sadowski
Raphael Katz
Sadowski Katz LLP
830 Third Avenue, 5th Floor
New York, NY 10022

Stephen Bergstein
Bergstein & Ullrich LLP
5 Paradies Lane
New Paltz, NY 12561

*For Defendants:*

Barbara D. Underwood
Attorney General of the State of New York
Helena Lynch
William A. Scott
Assistant Attorneys General
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

In this action, Plaintiff Jeffrey Monsour alleged that Defendant New York State Office for People with Developmental Disabilities ("OPWDD") retaliated against him in the course of his employment with the agency in violation of section 504 of the Rehabilitation Act of 1973 (codified at 29 U.S.C. § 794), and that Cathy LaBarge, a former OPWDD employee, retaliated against him for exercising his First Amendment right to freedom of speech.[1] (Dkt. No. 58, ¶¶ 1, 104–115). A five-day jury trial was held from November 14, 2017 to November 20, 2017. At the close of the evidence and before submission of the case to the jury, Defendant OPWDD moved for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. The Court denied the motion subject to renewal after trial and submitted the case to the jury. The jury returned a general verdict, finding Defendant OPWDD liable on the Rehabilitation Act retaliation claim and awarding nominal damages, but did not find Defendant LaBarge liable for First Amendment retaliation. Presently before the Court are two motions: (1) Defendant OPWDD's renewed motion for judgment as a matter of law under Rule 50(b), (Dkt. No. 193); and (2) Plaintiff's motion for attorneys' fees and injunctive relief, (Dkt. Nos. 187, 201). For the reasons set forth below, Defendant OPWDD's motion for judgment as a matter of law is denied, Plaintiff's motion for attorneys' fees is granted in part and denied in part, and Plaintiff's request for injunctive relief is denied.

---

[1] Plaintiff's Corrected Second Amended Complaint asserted a state law claim that was dismissed before trial. (*See* Dkt. No. 101, at 25–26).

## II.    BACKGROUND

Familiarity with the facts of this case is assumed based on this Court's previous decisions. (*See* Dkt. No. 101 (decision on summary judgment); Dkt. No. 167 (decision on motion in limine)). Defendant OPWDD is an agency of the State of New York, which coordinates services for individuals with developmental disabilities and runs group homes (also known as Individual Residential Alternatives, or "IRAs") that provide room, board, and individualized services options. (Dkt. No. 101, at 2). Defendant OPWDD has employed Plaintiff since July 1999 as a Direct Support Assistant ("DSA") responsible for providing direct care to people with developmental disabilities and assisting them with living on their own. (*Id.* at 3).

### A.    Corrected Second Amended Complaint

In the October 20, 2014 Corrected Second Amended Complaint (the "CSAC"), the operative pleading, Plaintiff alleged that he is a whistleblower who has spoken out about his concerns regarding Defendant OPWDD's operation of its group homes and discrimination against people with disabilities. (*See, e.g.*, Dkt. No. 58, ¶¶ 8, 14, 48). He claimed that, as a result of his advocacy, which was described in a March 2011 *New York Times* article covering allegations of abuse in OPWDD's group homes, Defendant OPWDD engaged in a "crusade of retaliation," retaliating against him by, among other things, placing him on administrative leave, denying him bids for other positions at the agency, and denying him promotions. (*Id.* ¶¶ 10, 16, 57–58, 89, 101, 103). Further, Plaintiff alleged that Defendant LaBarge, formerly OPWDD's Director of Labor Relations for the Capital District, retaliated against him, including by writing an email, which she placed in his personnel file, that falsely accused him of psychologically abusing individuals with disabilities. (*Id.* ¶¶ 9–10). The CSAC asserted: (1) a claim against Defendant OPWDD for retaliation under section 504 of the Rehabilitation Act; (2) a claim against Defendant LaBarge for retaliation in violation of the First Amendment's guarantee of

free speech; and (3) a claim against Defendant LaBarge for violation of the New York Human Rights Law ("NYHRL"). (*Id.* ¶¶ 104–118).

### B.      Summary Judgment and Reconsideration

In its summary judgment decision on July 7, 2017, the Court ruled that Plaintiff's First Amendment and Rehabilitation Act claims could proceed to trial but dismissed the NYHRL claim. (Dkt. No. 101, at 26). In so doing, the Court concluded that some of Plaintiff's asserted protected activity under the Rehabilitation Act was not protected activity under the Act, including Plaintiff's complaints about a "Fright Fest" outing[2] and his complaints about systemic failures at OPWDD—the close proximity of a group home's drinking well to a septic system and OPWDD's failure to conduct radon gas testing. (*Id.*). The Court noted that Plaintiff had "provide[d] no argument" why "his complaints pertained to discrimination against OPWDD residents based on their disabilities." (Dkt. No. 101, at 22). The Court nevertheless reviewed the record for other potential protected activity and identified two events that could "suggest that he did complain about unlawful discrimination" against disabled people: first, his complaint about the diversion of staff resources from "lower functioning individuals," and second, his complaint about the alleged mistreatment of a disabled resident identified as MAG. (*Id.* at 22–23). The Court thus denied summary judgment on the Rehabilitation Act claim. Having found that there were material issues of fact for trial, the Court did not consider Plaintiff's other Rehabilitation Act allegations. (*Id.* at 25 n.26).[3] The Court noted that, "[t]o the extent Plaintiff seeks to raise other issues at trial, Plaintiff will need to identify other specific instances of protected conduct

---

[2] Plaintiff spoke out about the fact that an OPWDD resident, a registered sex offender, allegedly came in close proximity to children during a so-called "Fright Fest" outing. (*Id.* at 22). Plaintiff alleged that, as a result of his complaint, OPWDD placed him on administrative leave, transferred him to another IRA, and denied him a promotion. (*Id.*).

[3] Defendant OPWDD's assertion that only two Rehabilitation Act allegations remained after summary judgment, (Dkt. No. 193-1, at 8), is thus not accurate.

and adverse actions that are causally connected to the protected conduct." (*See* Dkt. No. 101, at 25 n.16).

Defendants moved for reconsideration of the Court's summary judgment decision. (Dkt. No. 102). At the hearing on the reconsideration motion, the Court noted that Plaintiff, in his response to the motion, "fail[ed] to tailor his arguments to the applicable law, which requires a showing of protected conduct and ca[us]ally connected adverse action." (Dkt. Nos. 118, 126, at 28–29). After reconsidering its decision in light of Defendants' arguments, the Court denied Defendants' motion to alter its original ruling because Plaintiff had raised triable issues of fact on his Rehabilitation Act claim. (Dkt. No. 126, at 25, 28). The Court directed Plaintiff to file a trial brief and to "specifically identify" in his trial brief "the conduct on which he seeks to rely as protected conduct and what adverse action is ca[us]ally connected to the protected conduct." (*Id.* at 29). The Court noted that Defendants could file a motion in limine seeking to exclude evidence of conduct that they believed was not protected under the Rehabilitation Act. (*Id.* at 29).

### C.  Pretrial Submissions and Motion in Limine

In his trial brief, Plaintiff singled out five protected activities, including the two matters the Court identified in its summary judgment motion (diversion of staff resources and treatment of MAG), two activities that the Court had previously rejected (Fright Fest and radon testing), and a fifth activity concerning Defendants' allegedly improper fire drills and falsification of fire drill reports. (*See* Dkt. No. 123). Plaintiff argued that these complaints were protected activities under the Rehabilitation Act because they were protests against Defendants' failure to provide reasonable accommodations to disabled individuals. (*See id.*). But the trial brief still failed to

connect Plaintiff's complaints to specific adverse actions by Defendants; accordingly, the Court requested additional briefing.[4]

In a motion in limine, Defendants sought, among other things, to exclude all evidence related to Plaintiff's Rehabilitation Act claim. (Dkt. No. 128). Partly granting and partly denying the motion, the Court determined that Plaintiff could proceed to trial on three of the five activities he asserted were protected under the Rehabilitation Act[5]—namely Plaintiff's complaints about the diversion of staff resources away from group homes with lower functioning individuals, the treatment of MAG, and fire drills that did not accommodate the disabled and falsified drill reports. (Dkt. No. 167, at 6–8). Plaintiff's complaints about the Fright Fest incident and the lack of radon gas testing, however, did not indicate that he was protesting discrimination by OPWDD on the basis of disability; thus, the Court granted Defendants' motion in limine as to these activities. (*Id.* at 8–13). Plaintiff's briefing identified various adverse actions, and although Plaintiff did not clearly link the various claimed adverse actions to each protected activity, the Court found that there were material issues of fact for trial regarding the requisite causal connection. (*See* Dkt. No. 167, at 7, 8, 14 & n.9).[6]

### D.     Trial

The trial started on November 14, 2017. On the second day of trial, Defendants objected to the introduction of evidence concerning an adverse action, which they argued had not previously been identified as an adverse action. (*See* Dkt. No. 189, at 111–113 (Defendants

---

[4] Plaintiff's supplemental brief included a 21-page appendix containing a "[t]ime line of temporal proximity of protected activity and animus adverse employment actions." (Dkt. No. 158-1).

[5] Protected activity is "action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). Defendant has not challenged the Court's ruling regarding protected activity.

[6] Defendant OPWDD suggests that the Court should have acknowledged or ruled on "Defendants' request for an adjournment." (Dkt. No. 193-1, at 9). Defendants raised the issue of an adjournment in one sentence in their motion in limine. (*See* Dkt. No. 159, at 4 ("Should the plaintiff finally identify a protected activity and a causally connected adverse action to the Court's satisfaction . . . the trial [should be adjourned] to properly prepare for and respond to this new allegation.")). The Court has not found any other reference to a request for a continuance of the trial date.

objecting to the introduction of portions of Plaintiff's Exhibit 87[7] concerning the May 13, 2011

denial of Plaintiff's bid for a DSA position at the Glens Falls IRA because "this is not an adverse

action that's been identified during the course of these proceedings")). Noting that Plaintiff had

identified the particular adverse action in his response to the statement of material facts at the

summary judgment stage, (*id.* at 111; Dkt. No. 93, ¶ 34),[8] the Court directed Plaintiff to "write

down and provide to the court and to opposing counsel the adverse actions on which you are

relying for the First Amendment claims as well as the Rehabilitation Act claims," (Dkt. No. 189,

at 114). The Court advised that Plaintiff would "be limited in the jury instructions to the adverse

actions that the court finds are sufficient to qualify as adverse actions." (Dkt. No. 189, at 114).

On November 16, 2017, Plaintiff filed a list of 24 adverse actions but did not indicate

whether the adverse actions related to his First Amendment claim or his Rehabilitation Act

claim. (*See* Dkt. No. 172). During a conference on November 17, 2017, (*see* Dkt, No. 191), the

Court determined that some of the claimed adverse events were not adverse or lacked evidentiary

support, (*see id.* at 30–31 (Adverse Events Nos. 14, 17, 18)); the Court indicated that Plaintiff

would "need to identify for the court the evidence" in support of some of the other adverse

actions, (*id.* at 29–30).

Later that day, at the jury instruction conference, the Court addressed the adverse actions

to be charged to the jury. (*See generally id.*). Some of the claimed adverse actions on Plaintiff's

list (Dkt. No. 172) were withdrawn voluntarily by Plaintiff, (*see* Dkt. No. 191, at 142, 147

(Adverse Events Nos. 9, 20)), some were set aside as nonretaliatory, (*see id.* at 124–28, 142–43

<hr>

[7] For ease of reference, citations to the parties' exhibits admitted into evidence at trial are denoted as "P-" or "D-" followed by the exhibit number. For example, Plaintiff's Exhibit 1 is cited as P-1, and Defendant's Exhibit 1 as D-1.

[8] In the statement of material facts submitted in support of its motion for summary judgment, Defendants noted that Plaintiff had identified seven bids which he asserted were denied for retaliatory reasons, one of which was the bid for the Glens Falls DSA position. (Dkt. No. 85-2, at 7–8).

(Adverse Events Nos. 1, 2, 10, 11, 15)), and some were deemed sufficient, (*see id.* at 132–36, 143–44, 147–48 (Adverse Events Nos. 4, 5–6, 13, 16, 22, 24)); as to the other claimed retaliatory acts, the Court reserved ruling pending further briefing by the parties, (*see id.* at 129–132, 136–47 (Adverse Events Nos. 3, 7–8, 12, 19, 21, 23). Additionally, the Court asked the parties to brief whether there was any evidence admitted at trial supporting Plaintiff's claim that he complained about diversion of staff resources from homes with lower functioning individuals to homes with higher functioning individuals. (*See id.* at 149–50).

After reviewing the parties' supplemental briefing (Dkt. Nos. 173–177), the Court excluded the claim regarding diversion of staff resources because no evidence in support was introduced at trial. (Dkt. No. 192, at 2–3). Likewise, the Court excluded several claimed adverse events as unsupported by the evidence. (*See id.* at 3 (discussing specifically the exclusion of Adverse Event No. 12); *see also* Dkt. No. 191, at 132, 147 (explaining that Adverse Events Nos. 3 and 23 would be excluded absent supporting evidence)).[9] In sum, the Court's jury instructions on the Rehabilitation Act claim listed two alleged protected activities: (1) OPWDD's allegedly improper fire drills and falsified fire drill reports; and (2) OPWDD's alleged mistreatment of a disabled individual identified as MAG. The jury instructions listed 10 alleged adverse actions:

(1) the denial on May 13, 2011 of a position at the Glens Falls IRA;
(2) his placement on administrative leave in July 2011 after being accused of striking a resident of the Stony Creek IRA;
(3) Defendant LaBarge's October 13, 2011 email (P-176);
(4) the placement of that email in his personal history file;
(5) the failure to include his rebuttal letter (P-181) in his personal history file;
(6) the denial on January 4, 2013 of a position at the Stony Creek IRA;

---

[9] Of the remaining adverse events for which a ruling had been pending, the Court decided to include in its jury instructions Adverse Events Nos. 7 and 8 as three separate adverse actions under the Rehabilitation Act. (Dkt. No. 180, at 26). Further, the Court merged Adverse Events Nos. 19 and 21 into one adverse action under the Rehabilitation Act. (*Id.*).

<ol start="7">
<li>the denial on March 13, 2013 of a position at the Gillis Road IRA;</li>
<li>the perineal care training he received on September 12, 2013;</li>
<li>the denial in April 2014 of a DSA position at the Stony Creek IRA; and</li>
<li>his placement on administrative leave on April 29, 2014.</li>
</ol>

(Dkt. No. 180, at 26).[10]

At the close of Plaintiff's case, Defendants moved for judgment as a matter of law under Rule 50(a). (Dkt. No. 191, at 4). The Court deferred ruling on the motion at that time. (*Id.* at 29–30). Defendants moved again for judgment as a matter of law under Rule 50(a) at the close of their case. (*Id.* at 115). The Court submitted the case to the jury subject to later deciding the legal questions raised by the motion. (*Id.* at 118). The jury found in Plaintiff's favor on his Rehabilitation Act retaliation claim in a general verdict, and awarded one dollar in nominal damages. (Dkt. No. 182, at 2–3). The jury further found, however, that Plaintiff failed to prove

---

[10] Defendant OPDWDD claims that "the Court incorrectly stated that Plaintiff had included [the Glens Falls IRA bid denial] in his November 3, 2017 [supplemental pretrial] brief." (Dkt. No. 193-1, at 12). The transcript citation for this assertion, however, refers to the Court's discussion of Plaintiff's Adverse Event No. 5, which concerned Plaintiff's placement on administrative leave in July 2011, not Adverse Event No. 4, which concerned the Glens Falls IRA position. (*See* Dkt. No. 191, at 133:3–5; Dkt. No. 172, ¶¶ 4, 5). In any event, Plaintiff raised this adverse action, as well as all of the other alleged adverse actions denying bids for positions, during discovery long before trial, (*see* Dkt. No. 85-2, ¶¶ 33-34) (Defendants' statement of material facts identifying seven bids that Plaintiff alleges were denied for retaliatory reasons)), as well as in the "time line" appendix attached to his pretrial brief, (*see* Dkt. No. 158-1 at 6, 15, 16).

Defendant OPWDD also contends that the July 2011 administrative leave adverse action, which is Plaintiff's Adverse Event No. 5, (Dkt. No. 172, ¶ 5), should not have been included because Plaintiff did not "submit evidence that an OPWDD employee, rather than an individual in OPWDD's care, accused him of abuse." (Dkt. No. 193-1, at 13). But as the Court explained at the conference with the parties on the morning of November 17, 2017, the adverse action was OPWDD's placement of Plaintiff on administrative leave, not the abuse accusation. (*See* Dkt. No. 191, at 134). The identity of the accuser is irrelevant.

Lastly, Defendant OPWDD suggests that Defendant LaBarge's October 13, 2011 email, its placement in Plaintiff's personnel file, and the absence of Plaintiff's rebuttal letter from his personnel file should not have been included in the jury instructions on the Rehabilitation Act claim because "Plaintiff later amended his argument to state that those alleged adverse actions were being asserted solely for purposes of the First Amendment claim." (Dkt. No. 193-1, at 13). Plaintiff, however, never stated that those adverse actions were asserted *only* under the First Amendment claim. On the contrary, Plaintiff's November 18, 2017 submission relating to the jury instructions explicitly asserted those adverse actions under both the Rehabilitation Act claim and the First Amendment claim. (*See* Dkt. No. 175, at 2–3). The Court did not rule, as Defendant asserts, that the LaBarge email and omission of the rebuttal letter were not adverse actions. (*See* Dkt. No. 191, at 30–31).

his First Amendment retaliation claim against Defendant LaBarge. (*Id.* at 2). Judgment was entered on November 21, 2017. (Dkt. No. 183).

On December 18, 2017, pursuant to Rule 50(b), Defendant OPWDD timely renewed its motion for judgment as a matter of law on the Rehabilitation Act claim. (Dkt. No. 187). Defendant OPWDD argues that Plaintiff failed to establish but-for causation linking his protected activities under the Rehabilitation Act to the claimed adverse actions. (Dkt. No. 193-1, at 5 (arguing that "there was no evidence at trial on which the jury could have rationally found that any of the alleged adverse actions would not have occurred but for any of Plaintiff's alleged protected activities")).

## III.    DEFENDANT OPWDD'S MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.    Evidence at Trial[11]

Plaintiff began working for OPWDD in July 1999, assisting disabled individuals living in group homes under OPWDD's care. (Dkt. No. 188, at 75, 78–79). Plaintiff testified that his performance evaluations at OPWDD were all good. (Dkt. No. 189, at 135–36). Plaintiff testified that he became concerned with "various safety concerns going on within the agency and the way the organization was run," (Dkt. No. 188, at 116), which prompted him to start making requests under New York's Freedom of Information Law ("FOIL") in 2006 and begin his whistleblowing activities, (*id.* at 81, 116).

One of the issues that Plaintiff was concerned about was OPWDD's handling of fire drills at its group homes. (*Id.* at 116). In or about 2007,[12] while Plaintiff was working at the Glens

---

[11] Only those facts relevant to Defendant OPWDD's motion are laid out below. The Court must view the evidence in the light most favorable to the party opposing the motion for judgment as a matter of law, and give that party the benefit of all reasonable inferences to be drawn from the evidence at trial. *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998).

[12] The Court notes that the March 13, 2011 *New York Times* article discussed below places the incident in 2004, not 2007. (*See* P-79).

Falls IRA, two managers conducted a fire drill at the house, but one of the residents, an individual with Down's syndrome, would not evacuate. (*Id.* at 122, 124). The two managers asked Plaintiff to repeat the drill the following day, but again the individual would not leave; eventually, he was able to evacuate, but Plaintiff noticed that the individual seemed afraid of the stairs because he was sitting on the stairs and going down one step at a time, blocking other residents' egress. (*Id.* at 123). This event prompted Plaintiff to make a FOIL request, and he received hundreds of documents concerning fire drills and related notices of discipline. (*Id.* at 125; *see, e.g.*, P-141). In spring 2009, four individuals died in a fire at an OPWDD facility. (Dkt. No. 189, at 36). Following the fire, Plaintiff emailed Max Chmura, a deputy director at OPWDD, stating, "I tried to reach out to you and Steve [Smits, another deputy director,] regarding . . . falsified Fire Evacuation Reports and I feel my concerns fell on deaf ears. I still have grave concerns regarding this issue and many other concerns." (P-132; Dkt. No. 189, at 36–37).

Plaintiff's whistleblowing and FOIL activities concerning fire drills were mentioned in a March 13, 2011 *New York Times* article documenting journalist Danny Hakim's investigation into problems at OPWDD's group homes. (*See* P-79, at 6–7). Plaintiff testified that he reached out to Mr. Hakim in 2010, approximately a year before the article was published. (Dkt. No. 188, at 153). They met several times, and Plaintiff shared documents he had received during the FOIL process, such as notices of discipline and fire evacuation reports. (*Id.* at 153–54, 157). Plaintiff hoped to "to shed a light on what was going on with OPWDD and the way the organization was being run." (*Id.* at 154). Quoting Plaintiff, the article described, among other things, the Glens Falls incident, Plaintiff's warning to Mr. Chmura about falsified fire drills, and the spring 2009 group home fire. (*See* P-79, at 6–8).

Plaintiff testified that "nobody wanted me in their group homes" after the article came out. (Dkt. No. 189, at 193). Jeremey Willett, a DSA who worked with Plaintiff, testified that "[t]here's an entire culture within the agency, and it's a very strong culture of dislike towards Mr. Monsour." (Dkt. No. 189 at 208). More specifically, Mr. Willett stated that OPWDD instructors "would make mention of Jeff either by name or alluding around his name that somebody went crying to the *New York Times* and caused the agency trouble." (*Id.* at 209). According to Mr. Willett, some "members of the management team were referring to [Mr. Willett] as Little Jeff and asshole" because Mr. Willet worked with Plaintiff and "was associated with him." (*Id.* at 209–10). When asked whether "people at OPWDD [were] angry" at Plaintiff and whether "administrators at OPWDD [found] his whistleblowing time consuming and exasperating," Defendant LaBarge testified that she "would have to say yes." (Dkt. No. 190, at 81). With regard to the *New York Times* article, Defendant LaBarge conceded at trial that she had testified during her deposition that OPWDD had "its own level of frustration over that." (*Id.* at 96–97).

Plaintiff raised the fire drill falsification issue several times after the publication of the *New York Times* article. He testified that "no actions [were] being taken," so he wrote a letter to the Inspector General of the State of New York on April 20, 2011, copying, among others, Mr. Hakim, state legislators, and OPWDD officials. (*See* P-205; Dkt. No. 189, at 49–50, 134). In that letter, Plaintiff indicated that he complied with state investigators' document requests concerning falsified fire evacuation reports and sought whistleblower protection. (*See* P-205). Approximately a year later, on March 27, 2012, Plaintiff emailed Samuel Spitzberg, an investigator at the Commission on Quality of Care (an oversight body for OPWDD), again raising the issue of falsified fire evacuation reports. (P-78; Dkt. No. 188, at 168–69; Dkt. No.

189, at 75–76). And on August 15, 2012, Plaintiff wrote an email to then New York Deputy Secretary of Health James Introne—copying, inter alia, Mr. Spitzberg—in which Plaintiff reported information about an "unsuccessful fire evacuation drill" at the Stewart Drive IRA. (*See* P-76; Dkt. No. 189, at 152–55).

### 1. May 2011 Denial of Position at Glens Falls IRA

In May 2011, approximately two months after the publication of the *New York Times* article, Plaintiff bid for a DSA position at the Glens Falls IRA. (Dkt. No. 189, at 139). OPWDD denied his bid on May 13, 2011, asserting that there was a gender-specific need. (*Id.*; P-87,[13] at P001340). One of Defendants' witnesses, Debra Murphy, testified that residents may choose to receive care only from same-gender employees, (Dkt. No. 191, at 57), and family members could request that their developmentally disabled relative receive intimate care from persons of a specific gender, (*id.* at 61). Plaintiff testified that, while he was at OPWDD, he performed "intimate care of females in [his] charge such as dressing, bathing or even changing diapers." (*Id.* at 382). Plaintiff testified that he was not aware of and had never seen any IRAs with all-male or all-female staff. (Dkt. No. 189, at 158–59).

### 2. July 2011 Administrative Leave

In July 2011, Plaintiff was interviewed by an OPWDD investigator concerning an incident at the Stony Creek IRA. (Dkt. No. 189, at 71). He was put on administrative leave for one day. (*Id.*). According to Plaintiff's testimony, the investigation determined that the allegations were unfounded. (*Id.* at 72).

---

[13] Only the following pages of Plaintiff's Exhibit 87 were admitted into evidence: P001340, -42, -50, -51.

### 3. October 2011 LaBarge Email, Placement of LaBarge Email in Personnel File, and Failure to Include Rebuttal Letter

Plaintiff's allegations regarding the LaBarge email arose out of an incident that occurred at the Hubbell Lane IRA in July 2009. (*See* D-1). According to the incident report—also known as a Form 147—Plaintiff and a coworker engaged in a "hot and heavy verbal argument" in front of LVN, a resident with developmental disabilities. (*See id.*). The Form 147 described that LVN was "extremely upset about the situation." (*See id.*). The incident was characterized as alleged psychological abuse. (*See id.*). A subsequent investigation "confirmed" the psychological abuse allegation, (D-3), and Plaintiff received a notice of discipline (an "NOD") dated January 4, 2010, (P-119). The NOD's statement of charges stated that Plaintiff had "engaged in a loud argument with a coworker in the presence of LVN, an individual with developmental disabilities, causing LVN to have a stress reaction requiring medical attention." (*Id.*). Plaintiff contested the NOD, and the matter came before an arbitrator on June 17, 2011. (Dkt. No. 188, at 132–33; *see* P-3). Ultimately, however, the parties settled, and a consent award was issued on September 30, 2011. (Dkt. No. 188, at 133; *see* P-3).

Under the consent award, Plaintiff agreed to accept a letter of reprimand and to not bid in the future on a position at any house where LVN would be residing or receiving services. (*See* P-3). The letter of reprimand, dated October 6, 2011, mentioned that a September 1, 2011 rebuttal letter by Plaintiff would "be attached to and made a part of the records relating to the Notice of Discipline dated January 4, 2010." (P-178). Further, the letter of reprimand provided that, after 18 months, Plaintiff would be entitled to have the NOD, the letter of reprimand, the consent award, and the rebuttal letter removed from his personal history file. (*Id.*). Plaintiff's rebuttal letter disclaimed any wrongdoing, (*see* P-181). In his rebuttal letter, Plaintiff asserted: "I believe that the notice of discipline was issued in retaliation for my activities as a whistleblower and as

an advocate for individuals with disabilities." (*Id.*). At trial, Plaintiff testified that the charges were unfounded. (*See* Dkt. No. 189, at 131).

Plaintiff has cited "personnel-file irregularities" with respect to this incident. (Dkt. No. 199, at 24). At some point after the settlement, Plaintiff made an appointment with Defendant LaBarge or her secretary to review his personnel file to ensure that OPWDD had "honored the agreement." (Dkt. No. 188, at 139). Plaintiff looked through the file and could not find his rebuttal letter. (*Id.* at 140). However, Plaintiff came across an October 13, 2011 email stapled to his NOD; the email was from Defendant LaBarge to two OPWDD officials, Jose Burgos and Derrick Holmes, and copied various OPWDD employees, including persons who could make decisions regarding Plaintiff's applications for promotions. (*Id.* at 140, 142, 145–46; Dkt. No. 190, at 224–25; P-176). In relevant part, the email stated:

> I just received a copy of Mr. Monsour's settlement and am dismayed and disappointed that it is not what Capital District DDSO agreed to when these negotiations were being discussed. . . . We held steadfast that we would NOT remove this NOD from Mr. Monsour's file as part of any settlement. We did recently agree that the Letter of Reprimand could be removed, as long as the actual NOD remained as a permanent part of his file. Now I see that the NOD only has to remain in his file for a period of 18 months. We would never agree to do that for our employees in an abuse case. Also, we held steadfast that there would be **no language** in the settlement suggesting "no admission of guilt", yet I see in Monsour's rebuttal letter . . . that he states "My agreement to receive the Letter of Reprimand and Consent Award is in no way an admission or guilt..." We did not have any discussion about any type of "rebuttal" statement to be included with this NOD, nor have we ever entertained a rebuttal statement in the past.

(P-176). Plaintiff testified that the email was "inaccurate, it's calling me an abuser." (Dkt. No. 188, at 142). Plaintiff cited testimony that he could have been, but was not, charged with psychological abuse. (Dkt. No. 189, at 249–50). Plaintiff was "shocked" to find such an email in his personnel file, which he believed violated the settlement agreement. (*Id.*).

### 4. January 2013 Denial of DA1 Position at Stony Creek IRA

Plaintiff applied for a Developmental Assistant 1 ("DA1") position at Stony Creek IRA.[14] (*See* Dkt. No. 189, at 87–88). On January 4, 2013, Plaintiff received a letter from OPWDD, denying his bid and stating that it had "selected another candidate for the position." (P-87, at P001342). Defendants introduced evidence that a candidate who ranked higher in seniority to Plaintiff received and accepted the position. (*See* Dkt. No. 190, at 155–56; D-12).

### 5. March 2013 Denial of Position at Gillis Road IRA

Approximately two months later, in March 2013, Plaintiff bid for and was denied a DSA position at Gillis Road IRA. (Dkt. No. 189, at 147–48; P-241). The stated reason for the denial was that there was a "gender specific need." (P-241). Plaintiff testified that around that time there were instances in which he was placed on administrative leave and instances in which he was involuntarily transferred. (Dkt. No. 189, at 79).

### 6. September 2013 Perineal Care Training

At some point in 2013, Plaintiff was assigned to the Fenway Circle IRA, a group home with male and female residents. (Dkt. No. 191, at 53; Dkt. No. 189, at 139–40). Plaintiff requested training on female perineal care because he had been directed to perform intimate care on female residents but was concerned that he "could make a mistake" as he had "never had official training." (Dkt. No. 189, at 139–40). In September 2013, the perineal care training was conducted by a registered nurse and observed by a treatment team leader, a "grade 12 supervisor," and other staff. (*Id.* at 142; Dkt. No. 191, at 55). Although Plaintiff believed that perineal care training was to be performed using a mannequin doll, the nurse asked Plaintiff to perform perineal care on a female resident, which Plaintiff refused to do. (Dkt. No. 189, at 141–43). The nurse proceeded to perform the perineal care in the resident's bedroom with the

---

[14] According to the trial testimony, a DA1 position is higher than a DSA position. (*See* Dkt. No. 189, at 185–86).

bedroom door open while "everybody stood there and watched." (*Id.* at 143). Plaintiff testified that this episode left him "beside [him]self" and caused stress. (*Id.* at 144).

### 7.     February–March 2014 Reports Regarding MAG

In late February 2014, Plaintiff emailed OPWDD employees about a Dunn Avenue IRA resident identified as MAG. (*See* P-47). Plaintiff noted that MAG was banging her head on hard surfaces and advised that this was a "medical concern" that "require[d] OPWDD's immediate attention." (*Id.*). In a follow-up March 5, 2014 email to Ms. Eggleston, the registered nurse, Plaintiff wrote: "It appears OPWDD has a normalcy bias concerning [redacted] 'Head Banging'. OPWDD is minimizing serious medical consequences that can be caused from 'Head Banging' on a hard floor." (*Id.*; Dkt. No. 189, at 97). Plaintiff testified that MAG's "forehead, over the years, had horrific scars across the front of it." (*Id.* at 93). On March 27, 2014, Plaintiff reported that MAG's physical therapist had called him "a fucking asshole and told [him] to get a hobby," causing Plaintiff to have a stress reaction and leave for the day. (*See* P-45; Dkt. No. 189, at 104). Plaintiff testified that he perceived the insult as a reaction to his concerns for MAG. (Dkt. No. 189, at 103).

### 8.     April 2014 Denial of DSA Position at Stony Creek IRA

On April 23, 2014, Plaintiff received a letter from OPWDD denying his bid for a DSA position at Stony Creek IRA; the reason for the denial was listed next to a checked box stating that "[a] more senior employee was offered and accepted the position."[15] (P-87, at P001351;

---

[15] Plaintiff also introduced an earlier denial letter, dated April 11, 2014, concerning the same position, but the only boxes that were checked were "Identification of Differences" and "Operating Needs of the Agency." (P-42). Both checked boxes added the following explanation: "See the attached email dated July 22, 2013 to you from me. Although both individuals no longer reside at Stony Creek IRA, one of them does attend Fort Edward Day Hab (FEDH) and this position required that you work at FEDH." (*Id.*). The April 23, 2014 letter contained the same language for the two boxes, but they were not checked off. (*See* P-87, at P001351). The parties did not explain the discrepancy between the April 11 letter and the April 23 letter at trial. Defendants, however, introduced a seniority list showing that Laurie Tracy had applied for the DSA position at Stoney Creek IRA and was senior to Plaintiff. (*See* D-27). Further, Defendants' witness Liam Stander, a treatment team leader for group homes including Stony

*accord* Dkt. No. 189, at 89–90). On cross-examination, Plaintiff said he was aware that the position had been awarded to an employee who started working at OPWDD in 1994 and was senior to Plaintiff. (*See* Dkt. No. 189, at 186–87).

### 9. April 2014 Administrative Leave

On April 29, 2014, Defendant LaBarge emailed various OPWDD employees to inform them that Plaintiff was being placed on administrative leave. (*See* P-7). The email stated:

> Apparently there was an issue last night at Stony Creek when the men who live there found out that [Plaintiff] would be returning to work there. They were very upset...Dr. Verzulli went up there...one of the individuals informed her of an allegation against [Plaintiff] where he allegedly pushed the individual (I hope I got that right)...something that allegedly happened a while ago.

(P-7). On July 30, 2014, Defendant LaBarge emailed Heidi-Lynn Wagner, an OPWDD employee, concerning the investigation of the alleged incident for which Plaintiff was being placed on administrative leave—which Defendant LaBarge referred to as "the (2 plus years old) incident at Stony Creek (alleged physical abuse)." (P-20). In response, Ms. Wagner stated that there could not be discipline for "anything that happened 2 years ago."[16] (*Id.*; Dkt. No. 190, at 124). During cross-examination, however, Defendant LaBarge clarified that

> administrative leave is definitely not discipline. What Heidi-Lynn was pointing out to me, which I already knew, was that we can't discipline someone for something that happens two plus years ago. What she didn't state, which I also already knew, was that that does not negate the need for an investigation. So even though something happened two plus years ago and we know we can't discipline the employee for it, we still have to protect the consumer, we still have to do an investigation, and we still have to put Jeff on administrative leave.

---

Creek IRA, testified that lateral positions are offered based on seniority and that Laurie Tracey was the candidate with the most seniority. (*See* Dkt. No. 190, at 193–94 (Liam Stander testifying about Defendants' Exhibit 27)).

[16] Ms. Wagner was apparently mistaken about the identity of the employee being investigated. (*See* P-20 (stating that "[w]e can't discipline *her* for anything that happened 2 years ago" (emphasis added)); Dkt. No. 190, at 170).

(Dkt. No. 190, at 170). Katherine Bishop, an OPWDD administrator, similarly testified that employees are "typically" placed on administrative leave while allegations of abuse are investigated. (Dkt. No. 190, at 60–61).

### B.    Standard for Judgment as a Matter of Law Under Rule 50(b)

Under Rule 50 of the Federal Rules of Civil Procedure, a district court may grant a motion for judgment as a matter of law against a party only if "a reasonable jury would not have a legally sufficient basis to find for the party" on a certain issue and a favorable finding on that issue is necessary for the party to maintain or defeat a claim or defense. Fed. R. Civ. P. 50(a). If a motion for judgment as a matter of law is made under Rule 50(a) and the court does not grant the motion before submission of the case to the jury, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion" upon its renewal after trial. Fed. R. Civ. P. 50(b). A Rule 50(b) motion may be granted only "if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (alterations in original) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008).

"In assessing the sufficiency of evidence to support a jury verdict, [a district court] must view the record in the light most favorable to the [nonmoving] party, assuming all reasonable inferences were drawn and all credibility disputes resolved in its favor." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004). The district court "may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Galdieri-Ambrosini*, 136 F.3d at 289; *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005) (observing that, on a motion for

judgment as a matter of law, the court "cannot weigh conflicting evidence, determine the credibility of witnesses, or substitute [its] judgment for that of the jury"). Although the Court "should review the record as a whole," it should "give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000) (quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2529 (2d ed. 1995)).

### C.     Discussion

To establish a prima facie case of retaliation under section 504 of the Rehabilitation Act, a plaintiff must show that: (1) he engaged in an activity protected by the Rehabilitation Act; (2) the defendant was aware of this activity; (3) the defendant took an adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action. *See Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002). "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. If a defendant meets this burden 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002).

At trial, the jury "may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Reeves*, 530 U.S. at 143 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981)); *see also Burdine*, 450 U.S. at 255 n.10 (noting that "there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation"). The

propriety of "judgment as a matter of law . . . in any particular case will depend on a number of factors," including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves*, 530 U.S. at 148–49.

According to Defendant OPWDD, the evidence at trial did not establish that Plaintiff's protected activities—his complaints about fire drills and the treatment of MAG—were causally connected to the adverse actions instructed to the jury, or stated differently, that the adverse actions would not have occurred in the absence of (i.e., but for) Plaintiff's protected activities.[17] (Dkt. No. 193-1, at 16). Defendant OPWDD argues that the causal connection between Plaintiff's protected activities and the adverse actions is speculative. (*See id.* at 19). For some of the adverse actions, Defendant OPWDD further claims that there is no evidence that the legitimate reasons it proffered for denying Plaintiff's bids were merely a pretext for discrimination. (*See id.* at 18, 24). Plaintiff responds that the jury could have reasonably found a causal connection between the adverse actions considered in the aggregate and his protected activities, especially his comments to the *New York Times*, and the retaliatory animus it generated. (*See* Dkt. No. 199, at 16–19). Plaintiff also maintains that there is evidence linking each adverse action to his protected activities. (*See id.* at 19–28). Having reviewed the record as a whole and considered the evidence in the light most favorable to Plaintiff, the Court finds that

---

[17] Both parties agree that but-for causation applies to Rehabilitation Act retaliation claims. (Dkt. No. 191, at 121–22). The causation standard remains unsettled in the Second Circuit. *See Eisner v. Cardozo*, 684 F. App'x 29, 30 (2d Cir. 2017) (noting that there is "an unsettled question of law in this Circuit as to whether a plaintiff must show, in order to succeed on her ADA retaliation claim, that the retaliation was a 'but-for' cause of the termination or merely a 'motivating factor'"). Nevertheless, the Supreme Court has held that a plaintiff must prove but-for causation in employment retaliation cases under Title VII, which contains causation language similar to the ADA's. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013); *see also Feist v. Louisiana*, 730 F.3d 450, 454 (5th Cir. 2013) (applying a but-for causation standard to ADA retaliation claim). Since Rehabilitation Act and ADA retaliation claims are analyzed under the same framework, *Treglia*, 313 F.3d at 719, the jury was instructed to apply a but-for causation standard. (*See* Dkt. No. 180, at 26–27).

there is sufficient evidence to support the jury verdict on the issue of causation with respect to at least one (and, as discussed below, not just one) adverse action as causally connected to at least one protected activity.

At trial, Plaintiff adduced evidence that Defendant OPWDD denied him a DSA position at the Glens Falls IRA in May 2011, only two months after the *New York Times* published an article highly critical of the agency. The article reported that the agency ignored Plaintiff's whistleblowing about falsified fire drill reports and recounted that a fire later killed disabled residents of an OPWDD group home. Plaintiff testified that, after the article's publication, "nobody wanted me in their group homes." (Dkt. No. 189, at 193). A colleague of Plaintiff's also testified that OPWDD employees made negative comments about Plaintiff for speaking to the *New York Times* and causing trouble for the agency. Even Defendant LaBarge acknowledged that OPWDD administrators were frustrated by the article.

Regardless of this evidence, Defendant OPWDD argues that Plaintiff failed to introduce evidence of pretext to rebut the proffered reason for denying his bid—that there was a gender-specific need at the Glens Falls IRA. (*See* Dkt. No. 193-1, at 18–21). Plaintiff, however, testified that he had never seen any IRAs with male- or female-only staff, and that he was responsible for performing intimate care on female residents. A reasonable juror could have credited Plaintiff's testimony and inferred from the close temporal proximity between the article's publication and the bid denial, as well as evidence of retaliatory animus toward Plaintiff, that OPWDD denied Plaintiff's bid for the Glens Falls IRA position because of his comments to the *New York Times*. *See Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."); *cf. Cover v. Potter*, No. 05-cv-7039, 2008 WL 4093043, at *3, 2008

U.S. Dist. LEXIS 66753, at *8–9 (S.D.N.Y. Aug. 29, 2008) (explaining that "a plaintiff 'need

not disprove a defendant's proffered rationale for its adverse actions'" but must prove by

preponderance of evidence that the defendant intentionally retaliated (quoting *Gordon v. N.Y.C.*

*Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000))). Defendant OPWDD's motion for judgment as a

matter of law fails on that basis alone.

Likewise, the Court rejects Defendant's argument regarding the denial of Plaintiff's bid

for a DSA position at the Gillis Road IRA in March 2013. Defendant OPWDD asserts that it

adduced evidence of a legitimate reason for the denial—a gender-specific need at the group

home—and that Plaintiff failed to introduce sufficient evidence from which a jury could have

found that this reason was pretextual. (*See* Dkt. No. 193-1, at 24–25). The record indicates

otherwise. In March 2012, Plaintiff was again emailing OPWDD's oversight body, the

Commission on Quality of Care, about falsified fire drill reports. And in August 2012, Plaintiff

reported information about an unsuccessful fire drill to a state official and individuals at the

Commission on Quality of Care. Although the denial of the Gillis Road IRA position took place

months later, the jury could have reasonably inferred that OPWDD's denial was causally

connected to Plaintiff's continued advocacy on this topic, especially given the aforementioned

evidence of the agency's hostile reaction to his advocacy. *Muñoz v. Manhattan Club Timeshare*

*Ass'n, Inc.*, No. 11-cv-7037, 2014 WL 4652481, at *2, 2014 U.S. Dist. LEXIS 132166, at *4–6

(S.D.N.Y. Sept. 18, 2014) (finding sufficient causation evidence in a case where the defendant's

"employees referred to [the plaintiff] as a 'complainer' a couple of months after he asked for an

accommodation," and rejecting lack-of-temporal-proximity argument given that the plaintiff's

"termination was the capstone to a longer campaign of retaliation that began shortly after his

complaint"), *aff'd*, 607 F. App'x 85 (2d Cir. 2015). With respect to pretext, the jury could

reasonably credit Plaintiff's testimony that he had never encountered a group home with gender-specific staff and that he was responsible for performing intimate care on female residents, and draw the inference that the proffered reason for denying his bid was pretextual. The Court declines to take up Defendant's invitation to second-guess the jury's credibility determinations and weighing of the evidence.

Defendant OPWDD's sole basis for challenging the jury verdict is the purported lack of causation between Plaintiff's protected activities and the claimed adverse actions. Plaintiff notes that the jury's general verdict form did not identify on which adverse action(s) it relied, and that the verdict should therefore be affirmed if there was sufficient evidence that any adverse action was causally connected. (Dkt. No. 199, at 20).[18] The Court agrees. Defendant OPWDD did not seek special interrogatories as to the allegations, and the Court must therefore let the jury's verdict stand if there is sufficient evidence to support a reasonable juror's finding that Defendant OPWDD subjected Plaintiff to at least one adverse action in retaliation for at least one of the two protected activities in which Plaintiff engaged. *See, e.g.*, *Morse v. Fusto*, 804 F.3d 538, 552–53 (2d Cir. 2015) (noting that, where "there are multiple factual bases for liability on a single claim, one or more of which is found to be defective, but where special interrogatories as to each factual allegation are not requested, the general verdict must be upheld if the remaining evidence is sufficient to support it") (quoting *AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F Supp.2d 385, 407 (S.D.N.Y. 2009), *aff'd*, 386 F. App'x 5 (2d Cir. 2010))). As discussed above, there was sufficient evidence at trial for a reasonable jury to find a causal connection between Plaintiff's protected activities and at least one of the claimed adverse actions. Because the Court

_____

[18] The jury instructions did not, as Defendant OPWDD asserts, (Dkt. No. 193-1 at 18), require that Plaintiff prove that *each* adverse action would not have been taken but for a protected activity. Plaintiff was required to prove that OPWDD took "an adverse action," and the jury was informed of ten alleged adverse actions. (Dkt. No. 180, at 23,25–26).

need not determine whether the evidence supports causation for all the other claimed adverse actions, the inquiry comes to an end. Accordingly, the Court denies Defendant OPWDD's motion for judgment as a matter of law.

## IV.    PLAINTIFF'S MOTION FOR ATTORNEYS' FEES

Following a five-day jury trial, the jury awarded Plaintiff one dollar in nominal damages for one claim against one Defendant. Plaintiff now moves for attorneys' fees and costs in the amount of $945,289.03 for pretrial and trial work, as well as $36,728.05 for post-trial work. The Court, in the exercise of its discretion under 29 U.S.C.A. § 794a(b), declines to award Plaintiff attorneys' fees for his counsel's pretrial and trial work but awards attorneys' fees for some of his counsel's post-trial work. Further, the Court finds that Plaintiff is entitled to costs under Federal Rule of Civil Procedure 54(d), for which he must submit a properly documented bill of costs as required by Local Rule 54.1.

### A.    Attorneys' Fees for Pretrial and Trial Work

Under the Rehabilitation Act of 1973, a "court, in its discretion, may allow the prevailing party, other than the United States, a reasonably attorney's fee as part of the costs." 29 U.S.C. § 794a(b). "The district court is given broad discretion in granting a fee award and assessing a reasonable fee under the circumstances of the case." *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997) (discussing 42 U.S.C. § 2000e-5(k), a discretionary fee-shifting provision similar to 29 U.S.C. § 794a(b), applicable in actions under Title VII of the Civil Rights Act of 1964).

"Determining whether an award of attorney's fees is appropriate requires a two-step inquiry." *Pino v. Locascio*, 101 F.3d 235, 237 (2d Cir. 1996). "First, the party must be a 'prevailing party' in order to recover." *Id.* A plaintiff who prevails on the merits of his case, even if the jury only awards nominal damages, is a "prevailing party" for purposes of the federal fee-shifting statutes. *See Farrar v. Hobby*, 506 U.S. 103, 112 (1992). Second, the prevailing party's

"requested fee must also be reasonable." *Pino*, 101 F.3d at 237. Courts presumptively use the "lodestar" approach to arrive at a reasonable fee. *Simmon v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009); *accord Millea v. Metro-N. R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) ("Both this Court and the Supreme Court have held that the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee.'"). The lodestar calculation "involves determining the reasonable hourly rate for each attorney and the reasonable number of hours expended, and multiplying the two figures together to obtain a presumptively reasonable fee award." *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 141 (2d Cir. 2007).

Nominal damage awards, however, receive special treatment.[19] In *Farrar*, the Supreme Court cautioned that "fee awards . . . were never intended to 'produce windfalls to attorneys,'" 506 U.S. at 115 (quoting *City of Riverside v. Rivera*, 477 U.S. 561, 580 (1986)), and observed that "[a]lthough the 'technical' nature of a nominal damages award or any other judgment does not affect the prevailing party inquiry, it does bear on the propriety of fees awarded," *id.* at 114. The Court further explained:

> Once civil rights litigation materially alters the legal relationship between the parties, "the degree of the plaintiff's overall success goes to the reasonableness" of a fee award . . . . Indeed, "the most critical factor" in determining the reasonableness of a fee award "is the degree of success obtained." . . . We have already observed that if "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole

---

[19] As Defendants note, (Dkt. No. 198, at 20), Plaintiff's reliance on *Millea* as the applicable authority for assessing a reasonable fee in this case is misplaced, (*see* Dkt. No. 187-1, at 10–11). *Millea* concerned the mandatory award of attorneys' fees in litigation under the Family and Medical Leave Act of 1993 ("FMLA"), where the plaintiff recovered "more than 100% of the damages . . . sought on that claim." *See* 658 F.3d at 166–68. That case did not address the award of attorneys' fees under a discretionary fee-shifting provision in a situation where the plaintiff obtained only nominal damages. *Cf. S.M. v. Taconic Hills Cent. Sch. Dist.*, No. 09-cv-1238, 2013 WL 1181581, at *4, 2013 U.S. Dist. LEXIS 38395, at *10–11 (N.D.N.Y. Mar. 20, 2013) (rejecting a plaintiff's argument that *Millea* prohibited across-the-board reduction of a fee award obtained in a case under the Individuals with Disabilities Education Act ("IDEA"), and reasoning that "fee awards are mandatory under the FMLA, whereas under the IDEA, the Court has discretion whether to award them at all").

times a reasonable hourly rate may be an excessive amount." . . . "Where recovery of private damages is the purpose of . . . civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought." Such a comparison promotes the court's "central" responsibility to "make the assessment of what is a reasonable fee under the circumstances of the case." Having considered the amount and nature of damages awarded, the court may lawfully award low fees or no fees without reciting the 12 factors bearing on reasonableness or multiplying "the number of hours reasonably expended . . . by a reasonable hourly rate."

In some circumstances, even a plaintiff who formally "prevails" . . . should receive no attorney's fees at all. *A plaintiff who seeks compensatory damages but receives no more than nominal damages is often such a prevailing party*. As we have held, a nominal damages award does render a plaintiff a prevailing party by allowing him to vindicate his "absolute" right to procedural due process through enforcement of a judgment against the defendant. In a civil rights suit for damages, however, the awarding of nominal damages also highlights the plaintiff's failure to prove actual, compensable injury. . . . When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, *the only reasonable fee is usually no fee at all*.

*Id.* at 114–15 (emphases added) (citations omitted); *see also Kassim v. City of Schenectady*, 415 F.3d 246, 253 (2d Cir. 2005) ("The Supreme Court has consistently stressed the importance of the degree of the plaintiff's success in the litigation as a factor affecting the size of the fee to be awarded.").

The Second Circuit applied *Farrar*'s holding in *Pino. See* 101 F.3d at 238. There, the plaintiff sued her former supervisor and the hospital where she used to work, alleging hostile work environment sexual harassment, constructive discharge, and retaliation in violation of Title VII, and seeking $21 million in compensatory and punitive damages. *See id*. The jury returned a verdict for the plaintiff on her hostile work environment claim against the hospital and awarded one dollar in nominal damages. *Id.* The Second Circuit distinguished this result from the outcome in *Cabrera v. Jakabovitz*, 24 F.3d 372, 393 (2d Cir. 1994), where "the plaintiff

prevailed on a novel issue of law—that landlords can be liable for employing real estate brokers who are engaged in racial steering." *Pino*, 101 F.3d at 239 (noting that, while "the plaintiffs in *Cabrera* received only nominal damages, their lawsuit created a new rule of liability that served a significant public purpose"). The court observed, however, that the "vast majority of civil rights litigation does not result in ground-breaking conclusions of law, and therefore, will only be appropriate candidates for fee awards if a plaintiff recovers some significant measure of damages or other meaningful relief." *Id.*; *see also id.* at 238 ("In short, while there is no *per se* rule that a plaintiff recovering nominal damages can never get a fee award, *Farrar* indicates that the award of fees in such a case will be rare."). Therefore, the Second Circuit held that "under *Farrar v. Hobby* attorney's fees and costs are usually not appropriate when a plaintiff recovers only nominal damages." *Id.* at 239. Since the lawsuit in *Pino* did not fit that "rare exception," the court concluded that the plaintiff's application for attorneys' fees should be denied. *Id.*

There are parallels between the jury verdict here and the one in *Pino*. Plaintiff sued an OPWDD supervisor and the agency who employed him, much as the plaintiff in *Pino* had sued her supervisor and the hospital where she worked. After amending his complaint several times and dropping a number of claims, Plaintiff settled on two retaliation claims, one under the First Amendment and the other under the Rehabilitation Act—a posture not unlike *Pino*'s three Title VII claims. And as in *Pino*, the jury found liability only on one claim and only against the employer entity, and even then only awarded one dollar in nominal damages. Further, the difference between the amount awarded and the amount sought—albeit not as large as in *Pino*— was very substantial. The pleadings do not specify the amount of damages sought, but Defendants have proffered an email that Plaintiff's counsel wrote OPWDD's counsel five days before commencing the lawsuit, which shows that Plaintiff sought $2 million in compensatory

and punitive damages, including $1 million in emotional distress damages. (*See* Dkt. No. 198, at 16; Dkt. No. 198-1, ¶ 3; Dkt. No. 198-2, at 2).[20] In other words, Plaintiff obtained half of one millionth of what he wanted. *Cf. Farrar*, 506 U.S. at 121 (O'Connor, J., concurring) (noting that the plaintiff "got *some* of what he wanted—one seventeen millionth, to be precise"); *Pino*, 101 F.3d at 238 ("We have before us a more dramatic difference: Ms. Pino asked for $21 million and got only $1.00.").

The "difference between the amount recovered and the damages sought," however, "is not the only consideration." *Farrar*, 506 U.S. at 121 (O'Connor, J., concurring). Plaintiff's "success might be considered material if it also accomplished some public goal other than occupying the time and energy of counsel, court, and client." *Id.* at 121–22. Despite the nominal damages award, the Court must therefore examine whether the litigation "result[ed] in ground-breaking conclusions of law" or yielded "other meaningful relief." *Pino*, 101 F.3d at 239.

Plaintiff argues that "his case raised a significant legal issue" because "Plaintiff suffered retaliation as a consequence of [his] whistleblowing . . . in the interests of residents who were unable to speak up for themselves." (Dkt. No. 187-1, at 9). He further argues that "[a]s opposed to a typical single-plaintiff employment discrimination case . . . this case raises a matter of

---

[20] Rule 408 of the Federal Rule of Evidence bars consideration of settlement negotiations "to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a). Here, however, Defendants are not offering evidence of such negotiations to prove the amount of Plaintiff's claims—after all, the jury has already found that the amount of Plaintiff's claims is one dollar; instead, they offer the evidence for the purpose of determining whether Plaintiff's application for attorneys' fees is reasonable. Other courts have considered this type of evidence in this limited context. *See Pino*, 101 F.3d at 237 (discussing the plaintiff's rejection of settlement offers and the amount of the offers); *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, 739 F. Supp. 2d 125, 135 (D. Conn. 2010) (observing that "[s]everal courts have looked to evidence of this type to determine the reasonableness of attorneys' fees"); *EMI Catalogue P'ship v. CBS/Fox Co.*, No. 86-cv-1149, 1996 WL 280813, at *2, 1996 U.S. Dist. LEXIS 7240, at *5–7 (S.D.N.Y. May 24, 1996) (ruling that Rule 408 does not bar evidence of settlement negotiations "offered to show that the Court's rejection of the claim should not merit an award of attorney's fees under the Court's power of equitable discretion"); *see also Ingram v. Oroudjian*, 647 F.3d 925 (9th Cir. 2011) (holding that the district court did not abuse its discretion by considering settlement negotiations in connection with deciding a reasonable attorneys' fee); *Lohman v. Duryea Borough*, 574 F.3d 163, 167 (3d Cir. 2009) (same). *But see Houston v. Cotter*, 234 F. Supp. 3d 392, 401 (E.D.N.Y. 2017) (refusing to "consider any settlement offer made by plaintiff in assessing the reasonability of his request for attorneys' fees").

profound public importance" and that "few cases in the Second Circuit alleg[e] that a state employee suffered retaliation in violation of the Rehabilitation Act for asserting the right of group home and other similarly-situated residents." (*Id.*). These arguments, however, merely describe the application of the Rehabilitation Act's antiretaliation provision to the particular facts of his case—not a new legal theory. *See McGrath v. Toys "R" Us, Inc.*, 409 F.3d 513, 518 (2d Cir. 2005) (finding that the plaintiff had failed to "establish a groundbreaking legal theory" where a legal provision protecting a class of individuals "had already been repeatedly and consistently recognized"); *Alvarez v. City of New York*, No. 11-cv-5464, 2017 WL 6033425, at *4, 2017 U.S. Dist. LEXIS 199813, at *9 (S.D.N.Y. Dec. 5, 2017) (finding no groundbreaking conclusion of law in an excessive force case, as "it has long been established that officers must use reasonable force"); *Dingle v. City of New York*, No. 10-cv-4, 2012 WL 1339490, at *8, 2012 U.S. Dist. LEXIS 54024, at *25 (S.D.N.Y. Apr. 17, 2012) ("[T]his case established no new law but instead involved the application of settled law to the facts of the case.").

The Court is unable to identify any "new rule of liability that served a significant public purpose" in this case.[21] *Pino*, 101 F.3d at 239. As Defendants point out, the legal framework for retaliation claims under the Rehabilitation Act is well established, *see, e.g.*, *Weixel*, 287 F.3d at 148, and courts have applied this framework in cases brought by plaintiffs alleging retaliation for their advocacy on behalf of disabled individuals, *see, e.g.*, *Payson v. Bd. of Educ.*, No. 14-cv-9696, 2017 WL 4221455, at *23–25, 2017 U.S. Dist. LEXIS 154296, at *82–84 (S.D.N.Y. Sept. 20, 2017) (finding that a school counselor and a special education teacher had established a

---

[21] Congress determined there is a public purpose to the private enforcement of the Rehabilitation Act's antiretaliation provision when it provided a private right of action and permitted discretionary fee shifting, and the Court recognizes that protecting advocates of disabled people against retaliation serves this purpose. But the question here is whether Plaintiff's case "result[ed] in ground-breaking conclusions of law" beyond the mere application of the Rehabilitation Act's antiretaliation provision to the facts of the case. *Pino*, 101 F.3d at 239. Plaintiff has failed to identify any new legal principle arising out of this litigation.

prima facie case of retaliation under the Rehabilitation Act for their advocacy on behalf of disabled students); *Stahura-Uhl v. Iroquois Cent. Sch. Dist.*, 836 F. Supp. 2d 132, 143–44 (W.D.N.Y. 2011) (ruling that special education teacher advocating for her disabled students had stated a claim for retaliation under the Rehabilitation Act).

Plaintiff has likewise failed to show that he obtained meaningful relief beyond the nominal damages award. While the CSAC requested judgment "[r]eferring the underlying civil rights allegations to the United States Attorney for investigation/prosecution" and "removing him from the hostile work environment, and placing him in a comparable replacement position," (Dkt. No. 58 at 32), Plaintiff never moved for, nor established his entitlement to, this specific relief. Further, as discussed below, Plaintiff's post-trial request for an "injunction prohibiting further retaliation" does not satisfy the requirements for injunctive relief and must be denied. (*See infra* Part V). In these circumstances, "the only reasonable fee is . . . no fee at all." *Farrar*, 506 U.S. at 115.

**B.    Attorneys' Fees for Post-Trial Work**

In civil rights litigation involving fee-shifting statutes, a prevailing party is entitled to recover reasonable attorney's fees "not only . . . [for] obtaining a favorable judgment but also . . . [for] successfully defending that judgment, whether against postjudgment motions or against an appeal." *Weyant v. Okst*, 198 F.3d 311, 316 (2d Cir. 1999) (citations omitted).[22] "Further, a reasonable fee should be awarded for time reasonably spent in preparing and defending an application for . . . fees." *Id.* Although the Court has determined that, under the circumstances of this case, attorneys' fees are not warranted for Plaintiff's counsel's pretrial and trial work, the

---

[22] The Second Circuit reasoned that a "culpable defendant should not be allowed to cause the erosion of fees awarded to the plaintiff for time spent in obtaining the favorable judgment by requiring additional time to be spent thereafter without compensation." *Id.* While the Court here declines to award any attorneys' fees to Plaintiff for obtaining a favorable judgment, as his victory is only nominal, Plaintiff nevertheless had to defend against Defendant OPWDD's challenge to the verdict, and his successful defense should not be uncompensated.

Court finds that Plaintiff is entitled to reasonable attorneys' fees for his successful defeat of Defendant OPWDD's motion for judgment as a matter of law, including time reasonably spent on the supplemental fee application relating to that motion.

As discussed above, the starting point for determining a reasonable fee is to calculate the lodestar amount by multiplying "the number of hours reasonably expended on the litigation . . . by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "[A] court may not adjust the lodestar based on factors already included in the lodestar calculation itself . . . . Instead, the lodestar can be adjusted only by factors relevant to the determination of reasonable attorneys' fees that were not already considered in the initial lodestar calculation." *Millea*, 658 F.3d at 167. "The presumptively reasonable fee boils down to 'what a reasonable, paying client would be willing to pay,' given that such a party wishes 'to spend the minimum necessary to litigate the case effectively.'" *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 493 F.3d 110, 112, 118 (2d Cir. 2007)). Applications for attorneys' fees should be "accompanied by contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done." *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1154 (2d Cir. 1983); s*ee also Scott v. City of New York*, 626 F.3d 130, 133 (2d Cir. 2010) (explaining that "*Carey* establishes a strict rule from which attorneys may deviate only in the rarest of cases"). "As the fee applicant, plaintiff bears the burden of documenting the hours reasonably spent by counsel, and the reasonableness of the hourly rates claimed." *Alicea v. City of New York*, 272 F. Supp. 3d 603, 609 (S.D.N.Y. 2017) (quoting *Allende v. Unitech Design, Inc.*, 783 F. Supp. 2d 509, 512 (S.D.N.Y. 2011)).

### 1.    Hourly Rates

A reasonable hourly rate must be in line with the rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Cruz v. Local Union No. 3 of IBEW*, 34 F.3d 1148, 1159 (2d Cir. 1994). In *Simmons*, the Second Circuit further elaborated on the "forum rule":

> [W]hen faced with a request for an award of higher out-of-district rates, a district court must first apply a presumption in favor of application of the forum rule. In order to overcome that presumption, a litigant must persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result. In determining whether a litigant has established such a likelihood, the district court must consider experience-based, objective factors. Among the objective factors that may be pertinent is counsel's special expertise in litigating the particular type of case, if the case is of such nature as to benefit from special expertise. . . . The party seeking the award must make a particularized showing, not only that the selection of out-of-district counsel was predicated on experience-based, objective factors, but also of the likelihood that use of in-district counsel would produce a substantially inferior result. . . . Among the ways an applicant may make such a showing is by establishing that local counsel possessing requisite experience were unwilling or unable to take the case, or by establishing, in a case requiring special expertise, that no in-district counsel possessed such expertise.

*Simmons*, 575 F.3d at 175–76 (citations omitted).

Plaintiff argues that his counsel is entitled to higher Southern District hourly rates—as relevant here, $650 for Robert Sadowski, $400 for Stephen Bergstein, and $200 for paralegal Javier Santiago—because "local attorneys did not want to take on New York State as an adversary, especially on a contingency basis." (Dkt. No. 187-1, at 14; Dkt. No. 187-2, ¶ 3; Dkt. No. 203, ¶ 5; Dkt. No. 203-2, ¶ 3). Plaintiff states: "I reached out to several attorneys through

2011 in Albany, as well as one in Queensbury. . . . The Queensbury attorney I contacted told me 'You can't sue the king.' Other attorneys did not return my calls."[23] (Dkt. No. 187-2, ¶ 3).

The Court agrees with Defendants that Plaintiff's representations about his efforts to locate local counsel are insufficient to rebut the presumption in favor of the local rule. As an initial matter, it is unclear why practitioners within the Northern District would be more reticent to sue New York State than those in the Southern District. Additionally, Plaintiff does not identify the in-district lawyers he contacted or detail the efforts he expended to retain local counsel with the ability or willingness to take on his case. His vague and speculative "understand[ing]" that local attorneys were unwilling to take the case on contingency is insufficient to show that experienced in-district attorneys would have declined to represent him. *Cf. Green v. City of New York*, No. 05-cv-429, 2010 WL 148128, at *7, 2010 U.S. Dist. LEXIS 2946, at *21–22 (E.D.N.Y. Jan. 14, 2010) (finding unpersuasive class counsel's claim that qualified local counsel could not be found, where class counsel had contacted only four law firms and conjectured that a class action plaintiff would have had to retain an out-of-district attorney), *aff'd*, 403 F. App'x 626 (2d Cir. 2010). Lastly, Plaintiff does not explain what objective criteria he used to select Mr. Sadowski and his law firm; indeed, Plaintiff makes no representation that Mr. Sadowski or his law firm had experience in discrimination or civil rights litigation. Nor does he aver that in-district lawyers would have achieved an inferior result.[24]

---

[23] Plaintiff fails to specify which in-district law firms he contacted. He identifies by name only two out-of-district law offices, aside from Plaintiff's counsel Robert Sadowski. (*See* Dkt. No. 187-2, at 2).

[24] As Defendants note, (Dkt. No. 198, at 27–28), Plaintiff's counsel repeatedly failed to frame the Rehabilitation Act claim under the governing legal framework. The Court and the parties consequently spent significant time and resources pinning down Plaintiff's theory of liability. This suggests that Mr. Sadowski and his law firm may have lacked experience in this area of law. Further, although Mr. Sadowski's law firm retained the services of Mr. Bergstein and his law firm for "motion practice" and "post-trial motions," and Mr. Bergstein represents that he has experience in civil rights litigation, (Dkt. No. 187-4, at 1), the Court notes that Mr. Bergstein's involvement did not prevent the aforementioned difficulties, (*see supra* Part II).

Since Plaintiff has failed to make a particularized showing to rebut the presumptive forum rule, the Court will apply the prevailing rates in the Northern District of New York. A review of cases in this District indicates that the following hourly rates (or rate ranges) are reasonable: $275–$345 for experienced partners; $150–$200 for attorneys with four or more years of experience; $120–$170 for attorneys with less than four years of experience; and $90 for paralegals. *See, e.g.*, *Broad Music, Inc. v. Rider Rock's Holding LLC*, No. 16-cv-1398, 2017 WL 2992498, at *3, 2017 U.S. Dist. LEXIS 109383, at *7–8 (N.D.N.Y. July 14, 2017); *Cupersmith v. Piaker & Lyons, P.C.*, No. 14-cv-1303, 2016 WL 1389987, at *3, 2016 U.S. Dist. LEXIS 47458, at *7–8 (N.D.N.Y. Apr. 8, 2016); *R.M. Railcars LLC v. Marcellus Energy Servs., LLC*, No. 14-cv-1167, 2015 WL 4508451, at *6, 2015 U.S. Dist. LEXIS 96491, at *15–16 (N.D.N.Y. July 24, 2015); *Curves Int'l, Inc. v. Nash*, No. 11-cv-0425, 2013 WL 3872832, at *5, 2013 U.S. Dist. LEXIS 104095, at *14–15 (N.D.N.Y. July 25, 2013). The Court will therefore use an hourly rate of $300 for experienced partners, $175 for associates, and $90 for paralegals.

### 2. Number of Hours

Sadowski Katz LLP ("SK") and Bergstein & Ullrich LLP ("Bergstein") have submitted supplements to their fee application for the work they performed after trial. (*See* Dkt. Nos. 201, 203, 203-1, 203-2). These fee supplements, however, include hours spent preparing and drafting the December 4, 2017 fee application, which covered the pretrial and trial work for which the Court is awarding no fees; these hours must therefore be excluded. Further, as Defendants correctly note, (Dkt. No. 204, at 2), SK's and Bergstein's bills include various tasks that are unrelated to Plaintiff's opposition to the Rule 50 motion or the supplemental fee application, (*see, e.g.*, Dkt. No. 203-1, at 3 (time entry for "OPWDD interrogation of JM by telephone")). If those hours are excluded, the total amount of time spent on the opposition to the Rule 50 motion is approximately 56 hours, and the total amount spent on the supplemental fee application is

approximately four hours. Defendants contend that "the claimed additional fees are inflated, both as to the hourly rates requested and the number of hours devoted to tasks," notably the "approximately fifty hours . . . devoted to drafting and reviewing a standard-length memorandum of law." (Dkt. No. 204, at 2).

The number of hours Plaintiff's counsel spent on the opposition to the Rule 50 motion and the supplemental fee application does not strike the Court as excessive. *See Battistoni v. Anderson*, No. 08-cv-8762, 2012 WL 12883777, at *10 (S.D.N.Y. Nov. 1, 2012)[25] (crediting the plaintiff with more than 61 hours spent opposing the defendants' Rule 50 motion and with a little less than 8 hours spent on the fee application); *see also Rickettes v. Turton*, No. 12-cv-6427, 2015 WL 3868070, at *13 n.6, 2015 U.S. Dist. LEXIS 81396, at *36 n.6 (E.D.N.Y. June 23, 2015) (noting that party spent 37 hours to oppose Rule 50 motion and reply in support of fee application); *Zhiwen Chen v. County of Suffolk*, 927 F. Supp. 2d 58, 74 n.11 (E.D.N.Y. 2013) (noting that the party spent about 57 hours to oppose a Rule 50 motion). Nevertheless, the Court finds the division of labor among SK partner Mr. Sadowski, SK paralegal Mr. Santiago, and Mr. Bergstein unreasonable. Some of Mr. Sadowski's time entries correspond to clerical or administrative tasks that his paralegal could have handled. (*See, e.g.*, Dkt. No. 203-1 (Mr. Sadowski billing for "[t]ranscript request" and "[o]btain[ing] trial transcript")). Such hours should be treated as paralegal work. *See Dotson v. City of Syracuse*, No. 04-cv-1388, 2011 WL 817499, at *26–27, 2011 U.S. Dist. LEXIS 20374, at *73 (N.D.N.Y. Mar. 2, 2011) (adjusting attorney's time entries to account for paralegal work performed by attorney), *aff'd*, 549 F. App'x 6 (2d Cir. 2013). Further, Mr. Bergstein's role in drafting the opposition to the Rule 50 motion could have been assigned to an associate, given that a second partner (Mr. Sadowski) was

---

[25] No Lexis citation available.

reviewing and editing the draft. *See Carey*, 711 F.2d at 1146 ("A trial judge may decline to compensate hours spent by collaborating lawyers or may limit the hours allowed for specific tasks . . . on the basis of [the court's] assessment of what is appropriate for the scope and complexity of the particular litigation."); *Dotson*, 2011 WL 817499, at *25, 2011 U.S. Dist. LEXIS 20374, at *69 (finding that the plaintiff had not established "the need for an additional attorney").

Therefore, the Court deems it appropriate to reassign some of Mr. Sadowski's time to Mr. Santiago and use an associate-level rate for Mr. Bergstein's work on the opposition to the Rule 50 motion. Based on the hourly rates discussed above, the lodestar calculation for the opposition to the Rule 50 motion and the supplemental fee application is reflected in the table below:

|  | Rate | Hours | Lodestar |
|---|---|---|---|
| *Opposition to Rule 50 Motion* | | | |
| Sadowski | $300 | 19.6 | $5,880 |
| Bergstein | $175 | 21.4 | $3,745 |
| Santiago | $90 | 14.6 | $1,314 |
| *Supplemental Fee Application* | | | |
| Sadowski | $300 | 0.9 | $270 |
| Bergstein | $300 | 0.4 | $120 |
| Santiago | $90 | 2.2 | $198 |
| *Total Eligible Post-Trial Work* | | | |
| Sadowski | | | $6,150 |
| Bergstein | | | $3,865 |
| Santiago | | | $1,512 |
| **TOTAL** | | | **$11,527** |

### C.    Costs

Under Rule 54(d)(1) of the Federal Rules of Civil Procedure, "costs . . . should be allowed to the prevailing party." Courts have awarded Rule 54 costs even when the prevailing

party recovered only nominal damages.[26] *See Dingle*, 2012 WL 1339490, at *8, 2012 U.S. Dist. LEXIS 54024, at *27–28. As the Supreme Court has explained, however, Rule 54 "costs" have a limited scope:

> Our decision is in keeping with the narrow scope of taxable costs. "Although 'costs' has an everyday meaning synonymous with 'expenses,' the concept of taxable costs under Rule 54(d) is more limited and represents those expenses, including, for example, court fees, that a court will assess against a litigant." 10 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2666, pp. 202–203 (3d ed.1998) (hereinafter Wright & Miller). Taxable costs are limited to relatively minor, incidental expenses as is evident from § 1920, which lists such items as clerk fees, court reporter fees, expenses for printing and witnesses, expenses for exemplification and copies, docket fees, and compensation of court-appointed experts. Indeed, "the assessment of costs most often is merely a clerical matter that can be done by the court clerk." *Hairline Creations, Inc. v. Kefalas*, 664 F.2d 652, 656 (C.A.7 1981). Taxable costs are a fraction of the nontaxable expenses borne by litigants for attorneys, experts, consultants, and investigators. It comes as little surprise, therefore, that "costs almost always amount to less than the successful litigant's total expenses in connection with a lawsuit." 10 Wright & Miller § 2666, at 203.

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 573 (2012). The Local Rules of the Northern District of New York further specify that the "party entitled to recover costs shall file, within thirty (30) days after entry of judgment, a verified bill of costs on the forms that the Clerk provides," and that the "party seeking costs shall accompany its request with receipts indicating that the party actually incurred the costs that it seeks." L.R. 54.1(a).

Plaintiff's initial fee application contains a request for pretrial and trial "expenses" in the amount of $24,557.34 incurred by Mr. Sadowski's law firm and $1,181.69 incurred by Plaintiff

---

[26] The Court recognizes that the types of costs recoverable under the fee-shifting provision of the Rehabilitation Act, 29 U.S.C.A. § 794a(b), might be broader than those recoverable under Rule 54. *See Dotson*, 2011 WL 817499, at *33, 2011 U.S. Dist. LEXIS 20374, at *91 (discussing the scope of costs under Title VII's fee-shifting provision). However, as discussed above, the Court has declined to award attorneys' fees under § 794a(b); for the same reasons, the Court denies an award of costs under § 794a(b) in excess of those permitted under Rule 54.

himself. (*See* Dkt. No. 187-1, at 16; Dkt. No. 187-3, at ¶ 28; Dkt. No. 187-2, ¶ 11). Plaintiff's

supplemental fee application contains a request for post-trial "expenses" in the amount of

$973.05 incurred by Mr. Sadowski's law firm. (*See* Dkt. No. 203, at 4). Plaintiff, however, has

failed to file a bill of costs as required by the Local Rules, and his counsel has also failed to

submit receipts substantiating costs incurred. Given Plaintiff's failure to comply with the

applicable rules, the Court denies the request for costs at this time, but grants Plaintiff leave to

file a compliant bill of costs within 14 days of this decision. *See Johnson v. Santamore*, No. 14-

cv-676, 2017 WL 4334136, at *2, 2017 U.S. Dist. LEXIS 160071, at *8 (N.D.N.Y. Sept. 28,

2017) (recounting that the court had "den[ied], *without prejudice*, Defendants' motion for a bill

of costs due to their failure to comply with Local Rule 54.1(a)(1)"); *Cent. N.Y. Laborers' Health*

*by Moro v. Fahs Constr. Grp., Inc.*, No. 13-cv-226, 2017 WL 5160119, at *4 (N.D.N.Y. Apr. 5,

2017)[27] ("A review of Gangemi's submission confirms that it does not comply with Local Rule

54.1 in several respects. Accordingly, the Court in its discretion will not award costs.").

## V.     INJUNCTIVE RELIEF

As part of his fee application, Plaintiff seeks "injunctive relief prohibiting Defendants

from further retaliating against him." (Dkt. No. 187). In his supporting affidavit, Plaintiff states:

"I have continued to blow the whistle on what I perceive is continued discrimination against the

disabled by OPWDD and have continue [sic] to be the recipient of retaliation after amending the

complaint in 2014, and which conduct was not part of this action and trial." (Dkt. No. 187-2,

¶ 5). The affidavit describes alleged instances of past retaliation, (*id.* ¶¶ 6–7), and continued

"whistleblowing against the discrimination of the disabled, (*id.* ¶¶ 8–9). Plaintiff argues that, as

he "has every right to continue to speak out on behalf [sic] these residents, he faces the risk for

---

[27] No Lexis citation available.

further retaliation." (Dkt. No. 187-1, at 18). Defendant OPWDD responds that Plaintiff's request for injunctive relief amounts to an impermissible injunction to obey the law. (Dkt. No. 198, at 33–34). The Court agrees that there is no basis for injunctive relief in these circumstances.

Injunctive relief is prospective in nature. *Warth v. Seldin*, 422 U.S. 490, 515 (1975) (characterizing injunctive relief as a "form of prospective relief"); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (observing that the "purpose of an injunction is to prevent future violations"); *Burritt v. N.Y. State Dep't of Transp.*, No. 08-cv-605, 2008 WL 5377752, at *6, 2008 U.S. Dist. LEXIS 102434, at *18 (N.D.N.Y. Dec. 18, 2008) ("The prayer for injunctive relief is clearly prospective in nature."). As a threshold matter, therefore, Plaintiff's request for injunctive relief must be denied to the extent he seeks to remedy past retaliatory actions.

Further, the Court agrees with Defendant OPWDD that Plaintiff's request for injunctive relief is too vague to satisfy the requirements for issuance of an injunction. *See* Fed. R. Civ. P. 65(d) ("Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."). Plaintiff does not set forth which specific acts of OPWDD and its agents must be enjoined. Instead, he seeks an order essentially requiring Defendant OPWDD to comply with the Rehabilitation Act's prohibition against retaliation. Such an "obey the law" injunction is plainly improper. *See Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) ("[U]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law."); *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) ("To comply with the specificity and clarity requirements, an injunction must 'be specific and definite enough to apprise those within its scope of the conduct that is being proscribed.'" (quoting *In re Baldwin–*

*United Corp.*, 770 F.2d 328, 339 (2d Cir. 1985))). Accordingly, the Court denies Plaintiff's request for injunctive relief.

## VI. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant OPWDD's motion for judgment as a matter of law (Dkt. No. 193) is **DENIED**; and it is further

**ORDERED** that Plaintiff's motion for attorneys' fees and injunctive relief (Dkt. No. 187) is **DENIED** in its entirety, and Plaintiff's supplemental motion for attorneys' fees (Dkt. No. 201) is **GRANTED in part** to the extent that Plaintiff is awarded $11,527 in attorneys' fees, but otherwise **DENIED**; and it is further

**ORDERED** that Plaintiff **may file a bill of costs within FOURTEEN (14) days** in accordance with Local Rule 54.1.

**IT IS SO ORDERED.**

Dated: July 9, 2018
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge